Arthur K. HELLERMANN, Plaintiff,

v.

George W. ROMNEY, Secretary of the Department of Housing and Urban Development, and Eugene H. Gulledge, Federal Housing Commissioner, Defendants.

No. 71–C–598.

United States District Court,
E. D. Wisconsin.

Feb. 11, 1976.

# 354

Charne, Glassner, Tehan, Clancy & Taitelman, by F. Thomas Olson and Irvin B. Charne, Milwaukee, Wis., for plaintiff.

William J. Mulligan, U. S. Atty., by William E. Callahan, Jr., Asst. U. S. Atty., Milwaukee, Wis., for defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

The plaintiff, sponsor-mortgagor and life tenant of a multi-family housing project in Nashville, Tennessee, has sued the Secretary of Housing and Urban Development (HUD) and the Acting Federal Housing Commissioner in a 12-count amended complaint. The action was tried to the court in November, 1975, after which both parties filed post-trial briefs. The plaintiff has informed the court that relief is no longer sought with regard to four of the twelve counts, and it is apparent from the absence of proof at trial and from the briefs that the same is true with regard to count 9 of the amended complaint. Accordingly, this opinion, which constitutes the findings of fact and conclusions of law required by Rule 52(a), Federal Rules of Civil Procedure, will address itself to the first seven counts of plaintiff's amended complaint.

The amended complaint alleges that the defendants and their agents arbitrarily and capriciously disallowed certain legitimate expenses in determining the size of the insured mortgage for the project, which reduced the size of the mortgage actually insured, required additional investment on the part of the plaintiff, and reduced the plaintiff's return on his investment. Before the project was completed, it was converted from one established under § 221 of the National Housing Act, 12 U.S.C. § 1715*l*, to one established under § 236 of the

Act, 12 U.S.C. § 1715z–1. The plaintiff claims that he was told by HUD officials that the conversion would not require any additional investment or expenditure on his part, but that such investment or expenditure was later required. Mortgage subsidies are provided by HUD to projects established under § 236, and the plaintiff claims that the amortization schedule established by HUD differs from that required by law, with the result that his mortgage payments for interest have been larger than legally required. Additional claims are made relating to undue delay on the part of HUD in granting rent increases, HUD's failure to establish rent levels adequate to cover service of the mortgage and provide a return on the plaintiff's investment, and HUD's refusal to allow the withdrawal of interest earned on deposits in a required "replacement reserve fund."

The parties have filed a stipulation of uncontested facts, which I adopt as my own findings. Additional findings of fact appear below in the separate discussions of each count of the amended complaint.

## COUNT I

On March 19, 1970, the plaintiff entered into a regulatory agreement with the defendant pursuant to § 236 providing for the endorsement by the defendants for insurance of a mortgage on the plaintiff's housing project in the amount of $807,500. (Ex. 98) The defendants also agreed to make subsidy payments to the mortgagee, on behalf of the plaintiff, based on the amount of the endorsed mortgage. The plaintiff contends that he was entitled to the endorsement of a mortgage in an amount considerably in excess of $807,500 and that the defendants acted arbitrarily, capriciously and in violation of applicable statutes and regulations in refusing to endorse a larger mortgage for the project. I believe the plaintiff has failed to meet his burden of showing that he is entitled to any relief under this cause of action.

In 1963 the plaintiff, already an experienced builder of public housing projects, entered into a contract for the purchase of the land upon which the project was constructed, and he subsequently paid $11,700 for the land. He submitted a "request for pre-application analysis of multifamily housing proposal" to the defendants on April 17, 1967 (Ex. 4), and was invited by the defendants on August 22, 1967, to file a formal application for a conditional commitment for mortgage insurance for a project to be constructed on that land. He was informed that an allocation of $650,000 of below market interest rate funds had been approved for his proposal and advised that the invitation to submit a formal application was conditioned on specified modifications in his original proposal, such as the inclusion of some one-bedroom units in the project. (Ex. 6)

On December 21, 1967, the plaintiff submitted an "application for project mortgage insurance" for a mortgage in the amount of $750,000 to be insured under the provisions of § 221(d)(3). (Ex. 13) The defendants issued a conditional commitment on January 31, 1968, to insure a project with a maximum mortgage amount of $784,200. (Ex. 24) This commitment was conditioned upon, among other things, a specified mixture of one and two-bedroom units to be constructed.

The plaintiff, by letter of February 9, 1968, requested two modifications in the proposed project: a reduction in the number of one-bedroom units and corresponding increase in the number of two-bedroom units and a change in the form of ownership of the project to a life estate in the plaintiff with the remainder in a third party approved by the defendants. (Ex. 25) On February 19, 1968, the defendants accepted the plaintiff's second proposed modification, but rejected the first, "because this would necessitate a complete rework of your proposal." (Ex. 26)

On June 10, 1968, the plaintiff applied for a firm commitment for an insured mortgage in the amount of $787,000 pursuant to § 221(d)(3), based on an estimated replacement cost for the project of $874,858. (Ex. 31) On June 20, 1968, a determination of maximum insurable mortgage in the amount of $787,000 was made by the defendants. (Ex. 36) This determination was based on the amount stated in the application, which was slightly lower than the amount based on the defendants' estimated replacement cost. A "commitment for insurance of advances" was issued by the defendants on June 25, 1968, in the amount of $787,000. (Ex. 43) Paragraph 3 of this commitment required the plaintiff to submit a construction contract with the general contractor to the defendants for approval.

This contract, between the plaintiff and Robert A. Utke, the remainderman, as owners, and the plaintiff, as contractor, was executed on August 12, 1968. (Ex. 45) It established the actual cost of construction as the measure of payments due the contractor, subject to a maximum of $676,917, denominated the "cash upset" amount. Actual construction costs were considerably in excess of this "cash upset" figure, and some other costs of developing the project, not included in the construction contract, were ultimately greater than the estimates used by the plaintiff in preparing his application and by the defendants in determining their commitments. Part of the increase in costs was the result of the plaintiff's decision to use materials and install fixtures of a quality higher than that required by the defendants' specifications.

After review of the plaintiff's certification of the increased expenses, the defendants disallowed $66,239, with the result that the recognized "actual cost" of improvements and land was insufficient to support the endorsement of an insured mortgage in an amount greater than $817,700. The defendants, however, did not increase the amount of the insured mortgage above the $787,000 already committed to the plaintiff's project. Subsequently, the plaintiff and the defendants agreed to convert the

project to a § 236 project, and the defendants' mortgage commitment was increased to $807,500, a figure accepted by the plaintiff and Mr. Utke on February 25, 1970. (Ex. 82) A mortgage in that amount was insured, pursuant to § 236, on March 19, 1970. (Ex. 90, 92)

Insurance of mortgages pursuant to § 236 is regulated by 12 U.S.C. § 1715z–1(j)(3), which reads in part: "To be eligible for insurance under this subsection, a mortgage shall meet the requirements specified in subsections (d)(1) and (d)(3) of section 1715*l* of this title, except as such requirements are modified by this subsection."

The relevant portion of § 1715*l*(d)(3) reads:

"To be eligible for insurance under this section, a mortgage shall—

. . .

(iii) not exceed (1) in the case of new construction, the amount which the Secretary estimates will be the replacement cost of the property or project when the proposed improvements are completed (the replacement cost may include the land, the proposed physical improvements, utilities within the boundaries of the land, architect's fees, taxes, interest during construction, and other miscellaneous charges incident to construction and approved by the Secretary), . . . *Provided further*, That in the case of any mortgagor (including an investor-sponsor), or public body, or a mortgagor meeting the special requirements of subsection (e)(1) of this section, the amount of the mortgage shall not exceed 90 per centum of the amount otherwise authorized under this section."

■ The statutory language indicates that the maximum mortgage amount depends upon an *estimate* of costs to be made by the Secretary *before* the actual costs are known—the estimate is of the replacement cost of the *proposed* improvements. Mortgagors of § 221 and § 236 projects are required by 12 U.S.C. § 1715r to certify to HUD that the full amount of their subsidized mortgage is needed to cover the allowable percentage of their costs, or to pay any unneeded portion of the mortgage proceeds to the mortgagee in reduction of the mortgage obligation.

■ As applied to the plaintiff's project, § 1715r required a certification that 90% of the actual costs equaled or exceeded $807,500; or if 90% of the actual costs amounted to less than $807,500, the excess portion of the mortgage would have to be immediately repaid. The purpose of the certification procedure is clear—to make certain that the proceeds of subsidized mortgages are used only for the intended public purposes and not diverted to other uses by mortgagors. The purpose of the maximum mortgage amount is also clear—to establish and limit in advance the commitment of public funds to any individual project, and to provide a disincentive for cost overruns to mortgagors, by denying any right to the use of subsidized mortgage proceeds for the financing of such overruns. The statutes give no support to the plaintiff's contention that where the actual costs of developing a project exceed the estimated costs, the mortgagor is entitled to an increase in the amount of the subsidized mortgage above that previously committed by HUD and accepted by the mortgagor.

■ The complaint alleges that the defendants set the amount of the allowable mortgage in violation of applicable regulations, but the plaintiff failed, both at trial and in his post-trial briefs, to reveal what regulations he believed had been violated, with but one exception. At trial, attention was focused on an attachment to Exhibit 25, which was labeled "project flow chart for accelerated multifamily processing." The document, which may be described as a schematic illustration of an administrative system for accelerating the processing of applications for mortgages on multifamily projects, is part of a handbook for use in the accelerated processing system. Near the center of the diagram are the words "F.H.A. Provides Continuous Consultation." The plaintiff contends that he

was not provided with such consultation, but he has not persuaded me that these words from a schematic illustration imposed any obligation on the defendants nor that he was deprived of consultation.

More than 130 exhibits were offered as evidence at the trial, a large number of which consisted of correspondence between the plaintiff and the defendants, and there was testimony relating to several telephone conversations and personal meetings between the plaintiff and the defendants relating to the development of the plaintiff's project. While the project which the plaintiff eventually agreed to construct was more similar in design to that first proposed by the defendants than to his own original proposal, it should be noted that the number of units constructed was virtually identical to that proposed in the plaintiff's application of December 21, 1967, the average number of rooms was smaller, and the insured mortgage amount was greater.

The plaintiff was allowed to alter the legal form of his ownership, as he requested, and was able to obtain a reduced labor wage rate, as he requested. His assent to the resolution of differences regarding both design and financial arrangements appears on the documents embodying each stage of the project's development. Under these facts, I am unable to find that the plaintiff was deprived of any right to consultation regarding the determination of the amount of the project's mortgage.

 There is also an allegation in the first cause of action that the plaintiff was put under duress in the setting of the insured mortgage amount. The plaintiff's proof showed only that he incurred costs in advance of the defendants' commitment of public funds to his proposed project, which costs would probably not be recovered unless the proposal met with the defendants' approval, and that the defendants' commitments of public funds were on a "take it or leave it" basis. The possibility of unrecoverable initial expenditures and "take it or leave it" commitments is not unusual, either in public or private contract negotiations, and such circumstances do not amount to duress. *John J. Harte Co. v. United States,* 91 F.Supp. 753, 755, 117 Ct.Cl. 309 (1950). Moreover, the plaintiff's failure to preserve his objection to the defendants' determination of the mortgage amount and his actual acceptance of the contract terms at every stage preclude him from complaining now that the contract terms were forced upon him. See *Loral Corporation v. United States,* 434 F.2d 1328, 1332, 193 Ct.Cl. 473 (1970).

For the above reasons, I find that the plaintiff is entitled to no relief under the first cause of action.

### COUNT II

 On his second cause of action, the plaintiff alleges that the amortization schedule utilized by the defendants in determining the amount of their subsidy payments to the mortgagee on behalf of the plaintiff is not in accordance with the provisions of 12 U.S.C. § 1715z–1, and that as a result, he has been required to pay substantially greater sums to the mortgagee for interest than is contemplated by that statute.

Interest reduction payments for § 236 projects are authorized by 12 U.S.C. § 1715z–1(c), which reads:

"The interest reduction payments to a mortgagee by the Secretary on behalf of a project owner shall be in an amount not exceeding the difference between the monthly payment for principal, interest, and mortgage insurance premium which the project owner as a mortgagor is obligated to pay under the mortgage and the monthly payment for principal and interest such project owner would be obligated to pay if the mortgage were to bear interest at the rate of 1 per centum per annum."

The amortization schedule utilized by the defendants follows the literal language of the statute, without deviation. (Ex. 263) The monthly payment to the mortgagee for principal and interest on

the plaintiff's 8½% mortgage is $5919.74, and the monthly payment for principal and interest on a 1% mortgage in the same amount would be $2041.82. Each month, under the schedule against which the plaintiff now complains, the defendants pay the amount of the mortgage insurance premium due that month plus $3877.92, the difference between the monthly payment figures set forth above. The effect is that the plaintiff's monthly payment is $2041.82, exactly that which would be due under a 1% mortgage. (Ex. 269)

The plaintiff does not suggest that the payments made by the defendant have been inadequate. Rather, he contends that an improper allocation of payments between interest and principal has caused his equity in the project to build up less rapidly than would be the case under a 1% mortgage. The plaintiff suggests that his monthly payments of $2041.82 should be allocated between principal and interest on the basis of the amortization schedule for a 1% mortgage, without indicating how the resulting deficiency in interest payments to the mortgagee could be met, absent subsidy payments from the defendants in excess of the statutory amount.

The plaintiff's view of the proper allocation of payments to principal and interest is without any statutory foundation and is totally inconsistent with the "Amendment to Note and Deed of Trust and Consolidation Agreement" executed by the plaintiff on March 19, 1970. (Ex. 93) Paragraph 6 of that document states, in part:

"The installments of interest and principal shall be applied first to interest at the rate of 8½% per annum upon the principal sum or so much thereof as shall from time to time remain unpaid, and the balance thereof shall be applied to principal."

For the above reasons, I believe that the plaintiff is entitled to no relief under the second cause of action.

## COUNT III

It is alleged in the third cause of action that the defendants represented to the plaintiff that the conversion of the plaintiff's project to § 236 could be effected without cost to the plaintiff over and above what he otherwise would have been obliged to pay under § 221. It is uncontested that the plaintiff paid the sum of $4037.83 as an initial advance mortgage insurance premium on March 19, 1970, the date on which final endorsement took place. The plaintiff contends that the representations of the defendants and the provisions of 12 U.S.C. § 1715z–1 entitle him to recover the amount of this payment from the defendants.

The defendants have conceded that a HUD official may have represented to the plaintiff that conversion could be effectuated without additional cost to the sponsor, and I find that such a representation was made. Permission to occupy the project had been granted as early as September of 1969, and the defendants contend that any such representation was nothing more than a prediction that any required payments would be payable from the project's rental income, not a guarantee that no additional payments would be required. This characterization, I note, is at least consistent with paragraph 6 of the commitment for insurance under § 236 which was accepted by the plaintiff and Mr. Utke on February 25, 1970, and which reads: "At final endorsement, the Mortgagee will pay the first year's mortgage insurance premium of ½ of 1% of the principal amount of the mortgage insured." (Ex. 82) The execution of this document almost a month before final endorsement is totally inconsistent with the plaintiff's claim of complete surprise at the time of endorsement.

However, it is not necessary to determine whether or not the plaintiff was "surprised" as a result of the representation made to him, since the rule applicable to this situation is that "government agencies cannot be estopped by acts of their agents." *Michals*

*v. Federal Savings and Loan Ins. Corp.,* 413 F.2d 144, 148 (7th Cir. 1969).

■ Therefore, if the plaintiff is to recover on this cause of action, it must be on the ground that 12 U.S.C. § 1715z–1 entitles the plaintiff to payment by the defendants of the advance mortgage insurance premium. The language of § 1715z–1(c), upon which the plaintiff relies, is set forth above. There is nothing in that language, however, which suggests that a mortgagor is entitled to subsidy payments for expenses to be paid prior to the commencement of his monthly mortgage amortization schedule. I believe that the defendants' characterization of the plaintiff's payment as an advance to the project, to be repaid to the plaintiff from residual receipts or from sale proceeds, should either become available, is appropriate. The fact that high vacancy rates resulted in insufficient operating income to cover expenses during this period does not entitle the plaintiff to payment from the defendants.

Therefore, I find that the plaintiff is entitled to no relief under his third cause of action.

### COUNT IV

The fourth cause of action is related to the third. Based upon the representation to the plaintiff that the conversion to a § 236 project could be effected without additional cost to the plaintiff, the plaintiff contends that he is entitled to the sum of $45,000 to repay operating expenses for the period from October 20, 1969, to June 1, 1970, and to repay "$23,-215.62 in additional interest resulting from delays in closing occasioned by the defendants, their predecessors, and their agents."

For the reasons set forth in the discussion of the third cause of action above, I believe that the plaintiff is not entitled to relief with respect to this cause of action, to the extent that it is based on estoppel.

■ The plaintiff also attempts to support his claim to repayment for oper-

ating expenses from the "cut-off" date to the date his § 236 subsidy commenced by pointing out that HUD now provides subsidies during that period. A brief quotation from the plaintiff's own post-trial reply brief disposes of this contention:

"The defendants point out that only since August, 1971, has the FHA granted a subsidy to the project sponsor back to the cut-off date and that the plaintiff would not have been entitled to any subsidy had he closed under the terms of the Section 221(d)(3) commitment. In this, the defendants are correct. However, if the plaintiff had refused to convert the project to one owned and operated under Section 236, he would not have had to pay a mortgage insurance premium and he would not have faced the problems and losses that resulted from the conversion." (pp. 11–12).

I note the failure of the plaintiff to prove that the conversion delayed the closing or resulted in problems and losses of a financial nature to him. Moreover, the above passage from the plaintiff's brief demonstrates that he voluntarily accepted the conversion to a § 236 project, taking advantage of the reduction from 3% to 1% in the interest rate which it offered. Just as a high vacancy rate and the resulting inability to meet the initial operating expenses of the project was no basis in the third cause of action for implying a right to reimbursement of the advance mortgage insurance premium where the plaintiff had previously agreed to pay it, the existence of operating losses is no basis here for implying a right to reimbursement of those losses for a period in which the plaintiff has agreed that no such right existed.

Accordingly, I believe that the plaintiff is entitled to no relief under the fourth cause of action of his complaint.

### COUNT V

■ Paragraph 2(a) of the Regulatory Agreement executed on March 19,

1970, by the plaintiff and the defendants provides in part:

> "Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Commissioner of an amount equal to $286.00 per month unless a different date or amount is approved in writing by the Commissioner. Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America, shall at all times be under the control of the mortgagee." (Ex. 98)

Since March 19, 1970, and except for periods when the requirement was waived by the defendants, the plaintiff has placed $286.00 in the replacement reserve fund each month. Interest on the sums deposited in the replacement reserve fund has accrued, and the interest has not been paid to, or withdrawn by, the plaintiff in any form, pursuant to instructions of the defendants' agents.

The defendants have answered the plaintiff's claim that the withholding of the accrued interest on the replacement reserve fund was without legal authority by stating at paragraph 16 of their answer:

> ". . . that the Reserve for Replacements Account is under the control of the mortgagee and that interest properly belongs to the plaintiff, and further, upon request of the mortgagee for permission to release same to plaintiff, such request would be granted assuming the mortgage to be current in all other respects."

However, the mortgage was not current in all other respects at the time that the defendants finally admitted the plaintiff's right to payment of the accrued interest, for a default in the mortgage payments had previously occurred.

I find that the defendants' wrongful representations regarding the withdrawal of accrued interest on the replacement reserve fund were the sole cause of the plaintiff's failure to obtain payment of that interest which accrued prior to default and that the plaintiff is entitled to payment by the defendants of that sum which was properly payable to him at the time of default, with interest from the date of default. Since the plaintiff's proof related to the accrual of interest on the replacement reserve fund both before and after default, counsel for the parties will be directed to inform the court, by stipulation if possible, of their calculation of the amount due to the plaintiff from the defendants under the above statement of liability.

## COUNT VI

 The plaintiff's sixth cause of action alleges that despite timely and adequate requests by the plaintiff for rent increases, the defendants have arbitrarily and capriciously refused to grant increases, have provided inadequate instructions for the preparation of requests for rent increases, and have delayed in the granting of otherwise sufficient rent increases, with resulting financial harm to the plaintiff.

Rents in § 236 projects are regulated by 12 U.S.C. § 1715z–1(f), which states:

> "For each dwelling unit there shall be established with the approval of the Secretary (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest due under a mortgage bearing interest at the rate of 1 per centum per annum; and (2) a fair market rental charge determined on the basis of operating the project with payments of principal, interest, and mortgage insurance premium which the mortgagor is obligated to pay under the mortgage covering the project. The rental for each dwelling unit shall be at the basic rental charge or such greater amount, not exceeding the fair market rental charge, as represents 25 per centum of the tenant's income."

Distributions to mortgagors are governed by 24 CFR § 236.50:

"(a) Dividends or other distributions, as defined in the charter, trust agreement, or regulatory agreement, may be declared or made only as of or after the end of a semiannual or annual fiscal period. The amount of any allowable distribution, or disbursement from surplus cash, shall not exceed in any 1 fiscal year more than 6 percent of the mortgagor's initial equity investment in the projects, as determined by the Commissioner.

. . . . .

"(c) The right to any allowable distribution or disbursement from surplus cash shall be cumulative."

Section 64205.2 of the FHA "General Mortgage Servicing" Handbook provided in part in 1969 that

"[With] the approval of the FHA a schedule of shelter rents must be established initially and maintained thereafter at levels that will provide reasonable charges to tenants and a fair return to the mortgagor . . . As a general rule, the objective in examining and approving an increase in rent is to compensate for demonstrated increases in operating expenses and taxes and thus afford the prospect of a rate of return to the owner not in excess of that which was allowed initially."

On June 10, 1968, in his application for a firm commitment, the plaintiff listed proposed basic rent levels sufficient to provide a total annual rent of $73,680 at 100% occupancy. (Ex. 31) When permission to begin renting the project was granted, rents were established at levels sufficient to provide $80,120 at 100% occupancy. Even after disallowing about $1,200 allocated to rental from the manager's apartment, this figure represents an increase of more than $5,000 over the plaintiff's earlier proposal. When the project was converted to a § 236 project, a further rental increase to $87,513, effective April 1, 1970, was authorized. (Ex. 77) Together, these increases

amounted to about 17% over a period of only twenty-two months.

Rentals were slow at the project, with the result that the average vacancy rate was over 16% during 1970. A profit and loss statement for the one-year period ending December 31, 1970, was submitted to the defendants by the plaintiff. (Ex. 112) The $83,815.20 figure listed for total annual rent at 100% occupancy differed from each of the previously authorized rent levels and from the figure of $85,049 which would have been obtained from operating the project at the $80,120 level for 4 months and at the increased § 236 level for 8 months. The plaintiff was requested to explain this deviation. (Ex. 113)

Subsequently, a statement for the first twelve-month period of operation under § 236 was prepared. (Ex. 116) This statement accompanied the plaintiff's request of May 21, 1971, for an increase in the total annual rent figure to $99,600. A projected increase in electricity costs of $3500 for the next year was "supported" by a newspaper article announcing an increase in electricity rates in Nashville said to amount to $50 per year for the average family living in a three-bedroom house, but there was no attempt to document its effect on the electricity bills of residents of one and two-bedroom low and moderate income apartments. (Ex. 117) Many other projected cost increases were simply asserted without any documentation. Two conferences regarding the plaintiff's request for a rent increase were held, and the plaintiff subsequently reduced the project's various service contracts to writing. On August 10, 1971, documentation of the plaintiff's projected cost increases was mailed to the defendants, and on August 15, 1971, by Executive Order 11615, 36 Fed.Reg. 15727, the President of the United States imposed a wage-price freeze, two days before the documentation was received by the defendants.

The plaintiff acknowledges in his brief that under the freeze, rent increases authorized but not implemented before Au-

gust 15, 1971, could not be placed in effect thereafter. He argues, however, that:

" . . . the price controls were not applicable to federally rent-controlled projects, for the Regulatory Agreements required under programs creating the projects constituted a contract between the sponsor and the government." (p. 18)

The plaintiff has cited no authority for this position, and I am aware of none which suggests that such an exemption from the wage-price freeze existed.

The plaintiff contends, alternatively, that even if rents were frozen after August 15, 1971, he is entitled to relief due to the defendants' delay in processing his rent increase request prior to that date. He relies primarily on the fact that he was not required to submit written documentation of the project's service contracts in support of subsequent rent increase requests. This reliance is misplaced, since it was the fact that the plaintiff had reduced the contracts to writing in 1971 and submitted them to the defendants at that time which enabled them to subsequently rely on an oral verification that the same contracts were in effect. As for the "confusion" which the plaintiff contends delayed the processing, I do not believe it can be laid at the doorstep of the defendants. The plaintiff testified that a profit and loss statement which he prepared would have given a distorted picture had he included accounts receivable in his computations. Accounts payable, on the other hand, were included. The plaintiff's accountant testified that his accounting procedure on an annual financial statement for the project was "a combination of cash and accrual."

On December 28, 1971, the Cost of Living Council established guidelines under which increases in rental levels could be granted. As applicable to the plaintiff's project, the guidelines were incorporated in HUD Circular 3210.1 which provided in part in paragraph 8b:

"Any or all of the following rent increments may be approved after De-cember 28, 1971, in accordance with regular HUD program procedures provided they do not exceed the guidelines established below, to arrive at the maximum rent allowable. Hence, the maximum rent allowable would be the base rent plus the 5-percent catch-up, plus the 2½ percent operating costs, plus a pro rata share of increased real estate taxes, government levies, and capital improvement costs."

On January 13, 1972, the defendants informed the plaintiff that they were prepared to authorize a rent increase to $95,735, which increase was authorized on February 4, 1972. (Exs. 157, 159) The plaintiff contends that an increase of $10,354.95 was authorized under these guidelines, but the section of an interoffice memo which he cites to support this position applies not to base rents but to market rents, which are much higher than base rents and are irrelevant to this rent increase. (Ex. 156) The defendants' proof demonstrated that if an error in the rent increase had been made, that error was in the plaintiff's favor.

Based on a report dated November 16, 1971, dealing with defaults on the October and November mortgage payments for the project, the plaintiff argues that paragraph 8e of HUD Circular 3210.1, dealing with projects for which allowable increases would be financially infeasible, authorized a larger increase for the project. (Ex. 145) The report does not support the plaintiff, however. It indicates that actual allowable expenses had increased some $7500 above those used initially in processing the project under § 236—and the amount of the rent increase which was actually authorized was over $8200.

The plaintiff continued to request rent increases, notwithstanding HUD Circular 3210, paragraph 8b(2), which stated:

"An increment up to 2½ percent may be authorized once each twelve months beginning December 28, 1971, to cover increased operating costs."

On December 29, 1972, the defendants approved an increase of 2½% in the total rent amount to $98,128.38. (Ex. 169)

On March 30, 1973, an amendment to the Regulatory Agreement relating to the project was executed, which amendment ended the plaintiff's responsibility to supply project tenants with electricity as a service included in their rent. (Ex. 514) Modified rent levels were approved on April 3, 1973, to reflect the change in utility billing. The effect of this change was to increase the rental income of the project by 2½%, after accounting for the reduced expense for electricity. After the receipt of additional information from the plaintiff, an additional rent increase of 5.32%, to a total annual rent of $90,234 without electricity, was approved on June 12, 1973. In a letter dated May 25, 1973, the plaintiff had requested a greater increase, but he also noted:

> "I re-affirm that we will not be able to immediately implement this amount as it is essential to maintain as full occupancy as possible. This figure would be a fair basis in setting the rent if it could be obtained.

> "We would not immediately increase any rent by more than $10.00 per month of any of our present tenants. From time to time we shall test the market to see how close to a fair and proper rent we can achieve without danger of excessive vacancies."

However, excessive vacancies was the project's major problem, illustrated by the difficulty in renting up the project at the time of initial occupancy, the 16% vacancy rate during 1970, the 10% vacancy rate mentioned by the plaintiff in a letter to the defendants of February 19, 1974, and the average vacancy rate of 18% for 1974 mentioned by the plaintiff in his reply brief at page 10. In view of the project's problems with high vacancies and the testimony relating to several additional projects which became available in the area, I am not persuaded that higher rent levels at the plaintiff's project would have increased its income rather than its vacancy rate. In this regard, I note that the plaintiff is now making full utilization of the rent supplement program, and does not claim that income has been insufficient to meet expenses since 1975.

For all of the above reasons, I believe the plaintiff is not entitled to relief under count VI.

## COUNT VII

■ The plaintiff's seventh cause of action alleges that the defendants wrongfully refused to include in the cost certification process the sum of $3,004 paid by the plaintiff as a builder's risk insurance premium, with the result that the plaintiff has no means available to him to recover that sum. The defendants have admitted that the builder's risk insurance premium should have been included in the cost certification, but deny that the plaintiff is entitled to judgment for $3,004 as a result.

The plaintiff contends that inclusion of the premium payment in the cost certification would have resulted in an increase in the mortgage of an equivalent amount. My finding, relative to Count I, that the mortgage on the plaintiff's project endorsed by the defendants was in as great a sum as that to which the plaintiff was entitled under the commitment accepted by him disposes of this contention. Nevertheless, I will review the effects such a mortgage increase would have had, in order to explain the adequacy of the defendants' proposal that the plaintiff recover his premium payment out of the residual receipts or sale proceeds of the project, as available.

Under the defendants' proposal to remedy the cost certification, the plaintiff could be repaid the full amount of his premium payment. In the event that residual receipts or sale proceeds never became available, however, the result would be a net outlay of $3004 on the part of the plaintiff. Had the plaintiff's mortgage been increased, as he claims it should have been, the mortgagee would have supplied the funds for the premium payment to the insurer, necessitating their repayment, with interest. Repayment would represent a net outlay by the plaintiff, either directly from his own funds or through a reduction in residual receipts out of which distributions to him were made. An increase in the

mortgage would, of course, raise the base upon which the plaintiff's distributions from the project are calculated by $300.40, which would, at most, increase distributions by $18.02 per year. Assuming the maximum distributions possible, the plaintiff's net outlay under his proposal would not be recovered through distributions for at least 167 years.

I believe that the defendants' proposed remedy, proposing complete repayment of the plaintiff's outlay to the full extent of residual receipts or sale proceeds, provides the plaintiff with more than he claims to be owed.

Accordingly, I find that the plaintiff is entitled to no relief under the seventh cause of action of his amended complaint.

## CONCLUSION

Therefore, IT IS ORDERED AND ADJUDGED that the plaintiff shall take nothing under the first, second, third, fourth, sixth and seventh causes of action of his amended complaint and that said causes of action be and hereby are dismissed on their merits, with costs to the defendants.

IT IS ALSO ORDERED AND ADJUDGED that the plaintiff recover of the defendants a sum equal to the accrued interest on the replacement reserve fund for the project involved in this action which was payable to him at the time of default, plus the interest which accrued on that sum from the date of default to the date of this order, without costs.

IT IS FURTHER ORDERED that counsel for the plaintiff and for the defendants meet and determine the amount defined in the immediately preceding paragraph of this order. In the event of a disagreement over that amount, counsel are directed to inform the court in writing on or before February 25, 1976, of their separate calculations of the amount so defined.