Lewis E. JOHNSON

v.

The SECRETARY OF/AND U. S. DE-
PARTMENT OF HOUSING AND UR-
BAN DEVELOPMENT and Federal
Housing Administration.

Civ. A. No. 77–3746.

United States District Court,
E. D. Louisiana.

Sept. 3, 1981.

William J. Dutel, Russell J. Nunez, Jr., New Orleans, La., for plaintiff.

Joan Elaine Chauvin, New Orleans, La., Charleen Berry, Fort Worth, Tex., for defendants.

CASSIBRY, District Judge:

In 1968 Congress declared that the national goal of "a decent home and a suitable living environment for every American family" had not been fully realized for many of the nation's lower income families. Accordingly, it amended the National Housing Act of 1934 by enacting the Housing

and Urban Development Act of 1968,[1] "to assist families with incomes so low that they could not otherwise decently house themselves ..." 12 U.S.C. § 1701t (1976). Section 236 of the National Housing Act ("Section 236")[2] is designed, in furtherance of this goal, first to encourage private industry to provide reduced rental housing by authorizing the Secretary ("Secretary") of the United States Department of Housing and Urban Development ("HUD") to subsidize the monthly interest payments on behalf of the owner of a rental housing project designed for occupancy by lower income families. Interest reduction payments equal to the difference between the monthly payment for principal and interest, which the project owner as mortgagor is obligated to pay at market rates, and the amount that the owner would pay if the mortgage bore interest at the rate of one percent (1%) a year, 12 U.S.C. § 1715z–1(c), result in lower operating costs. This enables Section 236 project owners to charge lower rents to their tenants. In return, project owners are strictly regulated in the amount of rent they may charge and the profits they may earn. 12 U.S.C. § 1715z–1(f)(1) and (e); 24 C.F.R. § 236.55. Second, Section 236 is intended to induce private lenders to finance low-cost housing projects by authorizing the Secretary to insure eligible mortgages (including advances during construction), which are held by approved mortgagees and are secured by property upon which the structure is to be built. 12 U.S.C. § 1715*l* (1976).

Laurel Gardens, a Partnership in Commendam, ("Laurel Gardens") is the sponsor/owner/mortgagor of the Laurel Gardens Apartments Project ("Laurel Gardens project" or "the project"), FHA # 064–44094–LD, a Section 236 federally insured multifamily rental apartment housing project designed for occupancy by lower income families. Plaintiff, Lewis E. Johnson ("Johnson"), is a general partner of Laurel Gardens and the general contractor for the project. By this action, Johnson seeks to recover damages against the Secretary of/and HUD based on a complaint which rather obliquely merges into one statement of "general allegations" what can best be analyzed as four separate claims. In his first two claims, Johnson contends that the Secretary improperly reduced the insurable mortgage originally authorized for the Laurel Gardens project first, by finding that an identity of interest existed between Johnson and one of his subcontractors, and second, by refusing to approve certain change order requests. Third, Johnson claims that he incurred damages when he relied to his detriment on a misrepresentation of material fact made by an authorized representative of the Secretary. Finally, Johnson alleges that the Secretary failed to approve retroactively, contrary to his agent's express representations, an increase in the management fees Johnson would receive under his housing management contract.

Trial was held on February 21, 22, 25, 26, and 27, 1980, before the Court sitting without a jury. After hearing the testimony and considering the pleadings, the designated depositions and exhibits received into evidence as well as the post-trial briefs submitted by the parties, the Court makes its findings of facts and conclusions of law in the following opinion.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### I. IDENTITY OF INTEREST CLAIM

##### A. BACKGROUND

On October 20, 1972, after application review, feasibility study, project appraisal and income analyses and other internal procedures, the Commissioner (hereinafter re-

---

1. Pub.L.No.90–448, 82 Stat. 476.

2. Congress originally enacted the National Housing Act in 1934. Act of June 27, 1934, ch. 847, 48 Stat. 1246. Subsequent amendments have added new housing programs such as the

one authorized by Section 236. Housing and Urban Development Act of 1968, Pub.L.No.90–448, Tit. II, § 201(a), 82 Stat. 498 [codified at 12 U.S.C. § 1715z–1 (1976)].

ferred to indistinguishably as the "Secretary") of the Federal Housing Commission (a bureau of HUD and hereinafter referred to indistinguishably as "HUD"), acting on behalf of the Secretary, and pursuant to Section 236 and the regulations promulgated thereunder, 24 C.F.R. §§ 236.1 *et seq.*, accepted the proposed Laurel Gardens project as an insurable risk and issued a Commitment for Insurance of Advances to BNO Mortgage Corporation ("BNO") with George E. Potter ("Potter") and Clifford W. Sherman ("Sherman") as sponsors. HUD committed to insure the mortgage note for 90% of the $1,174,643 replacement cost of the project to a maximum of $1,057,100.

Despite the parties' failure to introduce into evidence the customary Regulatory Agreement (FHA Form 3135), one of the principal documents which forms the contractual relationship between the Secretary and a Section 236 sponsor, the evidence clearly indicates that on April 19, 1973, the Secretary, pursuant to his Commitment to Insure, executed an agreement to insure the mortgage for the Laurel Gardens project,[3] subject to any reductions required by the National Housing Act or the applicable regulations. The Secretary is authorized even before the actual costs of a project are known, to commit public funds for the insurance of a § 236 mortgage. That commitment of funds, however, is limited in advance to a maximum amount which is based on the replacement cost of the proposed project. 12 U.S.C. §§ 1715z–1(j)(3) and 1715*l*(d)(3)(iii). The Secretary's agreement to insure the mortgage of the Laurel Gardens project was limited to a maximum amount of $1,057,100. The maximum insurance amount discourages cost overruns by denying the mortgagor the right to use subsidized mortgage proceeds to finance such overruns. *Hellerman v. Romney*, 409 F.Supp. 352, 356 (E.D.Wisc.1976).

Upon completion of construction, a Section 236 project mortgagor will not necessarily be entitled to the maximum mortgage amount originally committed by the Secretary. Section 227 of the National Housing Act, 12 U.S.C. § 1715r, prohibits the Secretary from insuring a mortgage until the mortgagor agrees to certify its "actual costs" upon completion of the project and prior to final endorsement of the mortgage. The "actual cost" of the project to the mortgagor includes amounts paid for labor, materials, construction contracts, off-site public utilities, streets, organizational and legal expenses, general overhead and up to a 10% allowance for builder's and sponsor's profit and risk. 12 U.S.C. § 1715r(c). Section 1715r requires the mortgagor of a § 236 project to certify that it will pay any unneeded portion of the mortgage proceeds to the mortgagee in reduction of the mortgage obligation. The cost certification process insures that the proceeds of an insured mortgage are used only for intended public purposes and are not diverted to other uses by mortgagors. *Id.* Laurel Gardens agreed, pursuant to § 1715r, to certify its actual costs and to repay any sums received in excess of its certified actual costs. That agreement is contained in FHA Form 3306, the Agreement and Certification.[4]

On May 6, 1974, Laurel Gardens by Johnson certified that the actual cost of the project as of February 28, 1974, was $1,047,765.[5] On May 23, 1975, the Secretary authorized for final endorsement a maximum insurable mortgage of $997,700. In reaching this amount, the Secretary ultimately disallowed $75,889 from the certified "actual cost" submitted by Laurel Gardens.[6] Of this amount, $40,376 was disallowed as a result of the Secretary's determination that an identity of interest existed between Johnson and Ward. Johnson contends that this amount was improperly disallowed. I agree.

---

**3.** Plaintiff's Exhibits P–4, P–5, P–22, P–83 and P–85.

**4.** Plaintiff's Exhibit P–85.

**5.** Plaintiff's Exhibit P–36.

**6.** Plaintiff's Exhibits P–36, P–42, P–44, P–51, P–62, P–69 and P–103.

## B. FACTS

### 1. THE SPONSORSHIP OF THE PROJECT

Prior to 1973, Johnson had no plans to construct, own or operate a § 236 federally insured multifamily apartment project. He and Warren Orr ("Orr"), however, owned the land upon which Sherman and Potter proposed to build the Laurel Gardens project. In January, 1972, while the parties were engaged in negotiations for the sale of the land to Sherman and Potter, Orr died. Johnson was appointed executor of Orr's estate and continued negotiations for the sale of the land.

As already stated, on November 20, 1972, the Secretary issued a 90-day Commitment to Insure the mortgage of the Laurel Gardens project based on a sponsorship composed of Sherman and Potter. Prior to the expiration of the Secretary's Commitment to Insure, however, the project was without a viable sponsorship. First, Sherman, who, in addition to serving as a sponsor of the project intended to act as the general contractor as well, died. Second, HUD determined that Potter would no longer be acceptable as a sponsor due to the deterioration of his financial status.

Since the Laurel Gardens project was now without a sponsor, Johnson decided to co-sponsor the project if a suitable co-sponsor could be found. Virgil Elliott ("Elliott"), who served as a consultant to Johnson and as a loan broker for BNO, solicited Nathan Jones, the then Assistant Director of the New Orleans Area HUD Office ("HUD/NOAO"), for recommendations of acceptable persons who might consider co-sponsoring the Laurel Gardens project with Johnson. Jones suggested that Elliott contact either Albert J. Ward ("Ward") or Trudie Black. Johnson, Elliott and Potter thereafter discussed with Ward, and on February 5, 1973, agreed upon, a proposal in which Johnson and Ward would sponsor respectively 47½% of the project while Potter would sponsor 5%.[7]

Ward additionally agreed to build the project as general contractor. Subsequently, on March 13, 1973, BNO submitted, and on March 16, HUD/NOAO received the documents necessary for the newly structured sponsorship.[8]

One week later, on March 20, 1973, Will E. May ("May"), then Vice-President in charge of operations at BNO, who handled the Laurel Gardens project for BNO, the mortgagee, notified Johnson, Ward and Potter that the expiration of the Commitment for Insurance of Advances issued by HUD to BNO had been extended to April 20, 1973. May further cautioned that due to the dubious and uncertain funding status of subsidized housing programs, further extensions would be unlikely. Accordingly, May advised the proposed sponsors that they should proceed to initial closing under the assumption that the new sponsorship would be approved.

May's assumption that the restructured sponsorship would be approved proved wrong and the future of the embryonic project was placed in uncertain jeopardy when on Monday, April 16, only four days prior to the expiration of the Secretary's Commitment to Insure, HUD/NOAO made an internal determination that Ward would not be acceptable as a sponsor. That determination was based on the construction problems and cost overruns Ward was encountering on another project. That same day, both Johnson and Ward learned of the latter's rejection as a sponsor. Ward, however, was confident that HUD/NOAO would reconsider its decision and assured Johnson that the matter would be resolved favorably prior to the April 20 initial closing date.

In anticipation that HUD/NOAO would reinstate Ward as a sponsor of the Laurel Gardens project, and to be prepared to complete initial closing by April 20, Johnson and Ward jointly borrowed $117,000 from

---

**7.** It was necessary for Potter to retain at least a token interest in the project to maintain the viability of the feasibility report which was in his and Sherman's names.

**8.** Plaintiff's Exhibits P–11, P–12 and P–13.

the Bank of New Orleans on April 19 and co-signed a promissory note dated April 20,[9] binding each other "in solido". The proceeds of the loan were intended to be used as a capital contribution to Laurel Gardens for the acquisition of the land owned by the estate of Orr on which the project was to be built. Concurrently, Johnson and Ward executed a written agreement that was intended to release Ward from any liability on the promissory note if HUD/NOAO failed to reverse its earlier determination rejecting Ward as a sponsor. At the time of the execution of the promissory note and release, neither Johnson nor Ward knew that Ward would ultimately be determined to be unacceptable by HUD/NOAO as a sponsor of the Laurel Gardens project.

After meeting with Ward, HUD/NOAO affirmed its previous determination rejecting Ward as a co-sponsor of the Laurel Gardens project. HUD's final decision on this matter was not conveyed to Johnson until approximately twenty-four hours prior to the expiration of the Commitment to Insure Advances. Elliott, however, had planned for the contingency that HUD/NOAO would choose not to reinstate Ward as a sponsor by preparing an alternate sponsorship in which Johnson would hold a 95% interest in Laurel Gardens as the general partner while Potter would remain a 5% limited partner. Johnson would additionally build the project as the general contractor. On April 19, the same day it rejected Ward finally, HUD/NOAO approved Elliott's proposal.

## 2. INITIAL CLOSING AND CONSTRUCTION

On April 20, 1973, the initial closing of the Laurel Gardens project was completed as scheduled. Documents, authored and prepared on FHA forms, necessary to commence the construction of a Section 236

project insured for advances are each executed by the initial closing date. Those agreements define the relationships between HUD, the project mortgagor/sponsor, the mortgagee and the general contractor. Although the initial closing of the Laurel Gardens project was formally scheduled to be held in the offices of HUD/NOAO on April 20, 1973, most of the documents were executed on April 19, 1973, in the name of Laurel Gardens, a Partnership in Commendam, consisting of Johnson, general partner and 95% owner and Potter, limited partner and 5% owner.

After initial closing, the construction phase of the project began. Due to the overnight, instantaneous change of sponsors, however, Johnson, who had not formerly planned on building the project, had had no opportunity to elicit bids and line-up subcontractors. Johnson, consequently, requested Jack Biquenet, his construction superintendent of nineteen years, to begin to obtain estimates for each portion of the project. Ward thereafter approached Johnson to bid on certain portions of the project. Despite Elliott's recommendations to the contrary, Johnson agreed to subcontract certain portions of the construction work on the project to Ward because Ward's bid was significantly lower than the cost that Biquenet estimated Johnson could perform the same work. On June 29, 1973 Johnson and Ward's Packaged Homes, Inc., of which Ward was president and principal stockholder, executed an agreement in which Ward promised to furnish certain materials and labor to Laurel Gardens.

During the construction phase of the project, Ward failed to submit to Johnson certain wage certifications required by HUD.[10] As a result, when, on February 5, 1974, Laurel Gardens applied for insurance for advance of $110,467.60 in mortgage proceeds, Jo Conlin, a wage requirement spe-

---

**9.** Johnson testified that the promissory note (Plaintiff's Exhibit P–55) bears the date April 20, 1973, even though Ward and he made the arrangements to borrow the funds on April 19, because April 20 is the date on which the parties intended the funds to be distributed and interest to begin to accrue. (T–501).

**10.** Section 212 of the National Housing Act, 12 U.S.C. § 1715c and 24 C.F.R. § 221.538 prohibit the Secretary from insuring a § 236 mortgage unless the general contractor certifies that the laborers and mechanics employed in the construction of the project have been paid wages not less than the wages prevailing in the locality in which the work was performed in

cialist in.the Architectural and Engineering Branch of HUD/NOAO recommended on February 6 to Carl Geyer, then Assistant Director, Technical Services Branch of HUD/NOAO, that the guarantee of further insured advances on the Laurel Gardens project be withheld until all wage certification discrepancies were resolved. After determining that the project was, as of that date, complete, Geyer made an underwriting decision to withhold a retainage of $75,-359.80, which he considered ample to protect HUD's exposure on potential wage liability.[11]

To induce Ward to submit the required labor certifications, Johnson withheld certain payments owed to Ward under the subcontract. Ward, in turn, on July 10, 1974, filed a lawsuit in the Twenty-Fourth Judicial District of Jefferson Parish, Louisiana, against Johnson and Laurel Gardens to recover damages that Ward alleged resulted from Johnson's default in failing to make payments in accordance with the parties' subcontract. As more fully discussed in Section III of this opinion, Johnson consented to judgment in Ward's suit on the same day in which the case was set for trial, December 10, 1974.

### 3. COST CERTIFICATION—IDENTITY OF INTEREST DETERMINATION

On May 22, 1974, HUD/NOAO received the cost certification documents for the Laurel Gardens project. Following a preliminary review of the Mortgagor's Cost Certification,[12] on June 18, 1974, Bruno T. Lohrmann, then Director of the Operations Division of HUD/NOAO sent to BNO a request for an additional ten items of information.[13] Item 7(c) requested that the mortgagor provide an explanation of a note payable to Johnson and Ward for $117,000 that appeared on the balance sheet of Laurel Gardens as of February 28, 1974. On September 23, 1974, Johnson submitted the requested information. In response to item 7(c), Johnson provided the following explanation: [14]

> Prior to the closing, Mr. Johnson and Mr. Ward, as your administration is aware, were going to form a partnership in commendam. In view of the fact the allocation of land was $148,700, this money was used as additional expense in closing of the loan originally, and Mr. Johnson would be sole obligor of the note with A. J. Ward being relieved of any obligation prior to final closing.

On November 21, 1974, HUD/NOAO forwarded its review of the cost certification for the Laurel Gardens project to the Dallas Regional Office for its review and concurrence.[15] Subsequently, Richard Morgan, Regional Administrator for the Dallas Regional Office, notified Thomas Armstrong, Director of HUD/NOAO, by memorandum

accordance with the Davis-Bacon Act, 40 U.S.C. § 276a.

11. As of the date of trial, HUD was withholding only approximately $199.00 of that amount.

12. FHA Form 2330; Plaintiff's Exhibit P–36.

13. Plaintiff's Exhibit P–40.

14. Plaintiff's Exhibit P–43.

15. Ordinarily HUD/NOAO had final authority to approve cost certifications without review by the regional office. Unless the personnel of HUD/NOAO sought the technical assistance of the regional office, HUD/NOAO normally approved cost certifications on its own authority. During the period of time in which the cost certification documents for the Laurel Gardens project were being processed, however, HUD/NOAO was under instructions to forward all multifamily housing cost certification documents to the Dallas Regional Office, Housing Production and Mortgage Credit, for its review prior to final endorsement. The evidence indicates in addition that the technical assistance of the regional office was necessary to complete the processing of the cost certification for the Laurel Gardens project. Aaron Hogan, Jr., then Chief of the Finance and Mortgage Credit Branch of HUD/NOAO testified that the note payable to Johnson and Ward and the sponsor's response to item 7(c), which had requested additional information regarding that note, suggested the possibility that an identity of interest existed between Johnson and Ward. Since Hogan could not resolve the issue conclusively, he determined that the cost certification should be forwarded to the Dallas Regional Office for technical assistance.

dated December 18, 1974, that the regional office had determined that an identity of interest existed between Johnson, the general contractor and Ward, a principal subcontractor, which identity of interest would require cost certification by Ward. Morgan stated that as a result, he could not approve the issuance of final endorsement because a maximum insurable mortgage could not be determined without Ward's certification of actual cost. Morgan also determined that the architect for the Laurel Gardens project, C. F. Brave, had an identity of interest with Ward because both were partners in another HUD project. The identity of interest between Ward and Johnson consequently would require the disallowance of all supervisory architect fees.

By letter dated January 2, 1975, Robert J. Villars, then Acting Director, Operations Division, HUD/NOAO, notified May of the identity of interest finding and of the necessity for Ward to cost certify. Prior to receiving Villars' letter, however, May had learned of the finding by phone. By letter dated December 26, 1974, May, on behalf of Laurel Gardens, protested the identity of interest determination and outlined for Armstrong those facts which indicated that no identity of interest existed between Johnson and Ward. Daniel Morrow, counsel for Ward's Packaged Homes, also contested the finding.

On January 8, 1975, Johnson, Ward and their attorneys, Elliott met with officials of HUD/NOAO to discuss the identity of interest determination and attempt to convince them that the decision rendered by the Dallas Regional Office should be reversed. According to Armstrong the matter was out of the control of HUD/NOAO and exclusively in the hands of the Dallas Regional Office. Armstrong testified that Johnson could do nothing to upset the regional office's determination; that it was firm and final.

Ward submitted his certificate of actual cost, received by HUD/NOAO on April 24, 1975, which indicated that he received $279,977 for his efforts in the construction of the Laurel Gardens project. Based upon that certification, $36,519 or 15% of total amount certified, was disallowed from the project's insurable mortgage amount.[16] Prior to the identity of interest finding, HUD/NOAO, Cost Section, on November 6, 1974, recommended that a total of $20,697 be disallowed from the certified "actual cost" of the project.[17] Their review of the cost certification documents submitted by

**16.** As discussed *infra*, pp. 939–940, the Agreement and Certification (Plaintiff's Exhibit P–85) authorizes the Secretary to reduce the mortgagor's certificate of actual cost by an amount equal to the subcontractor's profit and general overhead under the subcontract if an identity of interest exists between the mortgagor and a subcontractor (or between the mortgagor and the general contractor and between the general contractor and a subcontractor), unless the Secretary in advance grants approval in writing of the subcontract and approves a specific dollar amount or a specific percentage for profit and/or general overhead.

No such advance amount was requested or approved by the Secretary for Ward's subcontract. Ward's certificate of actual costs, however, provided no basis from which to calculate a profit/general overhead disallowance because it failed completely to properly itemize material quantities, model numbers, brand names, unit prices, lumber grades, labor costs, etc. (T.–436–454). Johnson and May notified HUD/NOAO in person and by letter (Plaintiff's Exhibit P–61) that six months would be required for Ward to fully comply with HUD's cost certification requirements. Accordingly,

they requested that the loan be processed for final endorsement despite the inadequacies of Ward's cost certification documents. William McCartney, then Chief of Program Support, Community Planning Development, HUD/NOAO, and Jack Henderson, Regional Cost Advisor, concluded that Ward's certification of actual cost was indeed unacceptable, but that delays in final endorsement could be avoided by calculating the profit/general overhead disallowance to be equivalent to a sum the Secretary would have approved had advance approval been requested. McCartney determined that had prior approval been requested, the Secretary would have allowed a percentage of 15% for profit and general overhead.

**17.** That amount is broken down as follows: (1) Bond Premium, $5,081; (2) Contractor's General Overhead, $881; (3) General Requirements broken down as (a) Topographic Survey—Sponsor's Cost, $325; (b) Soil Tests—Sponsor's Cost, $647 and (c) Excessive Clean-up Costs (over subcontract amount), $5,063 and (4) Draperies, $8,070.

Laurel Gardens did not find the cost of the subcontract work performed by Ward to be unreasonable or not within estimated costs of like trade items. The Dallas Regional Office revised upward the total amount disallowed from the certified "actual cost" of the Laurel Gardens project to total $75,889.[18] Of that amount, $40,376 was disallowed as a result of the determination that an identity of interest existed between Johnson and Ward.[19]

On May 23, 1975, Armstrong approved for final endorsement for insurance a mortgage loan for Laurel Gardens in the amount of $997,700.[20] As of May 22, 1974, the date on which the cost certification for the project had been submitted, Laurel Gardens had drawn $920,782.19 in monthly advances of mortgage proceeds. Between May 22, 1974 and May 23, 1975, HUD/NOAO did not approve (nor does the evidence indicate that it requested to approve) any monthly advances of mortgage proceeds. Hence, on June 30, 1975, HUD/NOAO approved $76,917.81 ($997,770—$920,782.19) for mortgage insurance, which amount had been requested by Laurel Gardens as final payment of mortgage proceeds. HUD/NOAO additionally approved BNO's request for final endorsement.

## C. JURISDICTION

Before turning to the merits of Johnson's first claim for damages against the Secretary, I must first consider four threshold questions.

### 1. SUBJECT–MATTER JURISDICTION

 The first issue is whether this court has subject-matter jurisdiction. The waiver of sovereign immunity contained in 12 U.S.C. § 1702, discussed *infra*, does not,

---

**18.** In addition to the disallowances itemized in n. 17, the following amounts were disallowed from the mortgagor's certificate of actual cost: (1) Land, Improvements and Structure, $36,519 (no written prior approval for inclusion of profit and overhead for identity of interest subcontractor (Ward); (2) Architect's Fee—Supervision, $1,700; (3) Interest During Construction, $247; (4) Taxes During Construction, $341; (5) Mortgage Insurance Premiums, $724; (6) FHA Examination Fee, $53; (7) Financing Discount, $5,285; (8) CPA Cost Certification Fee, $2,950; (9) Builders and Sponsors' Profit and Risk Al-lowance (BSPRA), $5,868; and (10) Income, $1,495.

**19.** *See* n. 18, items (1), (2) and (9).

**20.** This figure represents the lesser of (1) the original mortgage amount less the minus effect of construction changes and unused contingency reserves or (2) 90% of the recognized actual cost of improvements plus the allowable land cost. The Secretary authorized final endorsement of a maximum mortgage amount determined pursuant to FHA Form 2580, "Maximum Insurable Mortgage" (Plaintiff's Exhibit P–69) as follows:

| | | | |
|---|---|---|---|
| 1. | (a) Original Mortgage Amount | | $ 1,057,100 |
| | (b) Less: Minus Effect of Construction Changes, if any | $. (44,928) | |
| | (c) Unused Contingency Reserve, if any (Rehabilitation) | $. . . .–. . . | |
| | (d) Total Deductions from Original Mortgage Amount | | $ (44,928) |
| | (e) Adjusted Original Mortgage Amount | | $.1,012,172.. |
| 2. | Certified "Actual Cost" (From FHA Form 2330) | $ 1,035,793 * | |
| 3. | Disallowed Amounts (Schedule 1) | $ 75,889 | |
| 4. | Recognized "Actual Cost" of Improvements | $ . .959,904 . . | |
| 5. | Land (Schedule 2) | $ 148,700 | |
| 6. | TOTAL LAND & IMPROVEMENTS | $ 1,108,604 | |
| 7. | Statutory Percentage of Total Cost ( 90 % of Item 6) | $ . 997,744 . . | |
| 8. | Lesser of: (i) $_____ Existing Mortgage Indebtedness on (Land and Improvements to be Rehabilitated) or (ii) an Amount Equal to ____% of the Fair Market Value $_____ of Land and Improvements Before (Repair or Rehabilitation) | $____–__ | |
| 9. | TOTAL – Line 7 plus Line 8, (if any) | | $ . .997,744 . . |
| 10. | Maximum Insurable Mortgage in Multiples of $100, (Item 1(e) or Item 9 whichever *is the Lesser*) *if Grants involved see Reverse Side of this Form for Reconciliation* of Adjustments, if Required | | $ 997,700 |

* Note: Laurel Gardens originally certified that the actual cost of the project was $1,047,653. The Mortgagor's Certificate of Actual Cost (Plaintiff's Exhibit 36), line 2.b.—Architect's Fee-Supervision, however, originally $13,500, was amended to $1700. See Plaintiff Exhibits P–40 (Item No. 6), P–43 (Item No. 6) and P–46.

contrary to the argument urged by the plaintiff, independently confer jurisdiction.[21] *Industrial Indem., Inc. v. Landrieu,* 615 F.2d 644, 647 (5th Cir. 1980); *Lomas & Nettleton Co. v. Pierce,* 636 F.2d 971, 972 (5th Cir. 1981); *Marcus Garvey Square, Inc. v. Winston Burnett Construction Co.,* 595 F.2d 1126, 1131 (9th Cir. 1979); *Ghent v. Lynn,* 392 F.Supp. 879, 889 (D.Conn.1975). Yet, it is clear, at least in the Fifth Circuit, that this court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331(a) (1976).[22] *Industrial Indem., Inc. v. Landrieu, supra,* 615 F.2d at 647; *Southern Sog, Inc. v. Roland,* 644 F.2d 376, 379–80 (5th Cir. 1981); *Trans-Bay Engineers and Builders, Inc. v. Hills,* 179 U.S.App.D.C. 184, 551 F.2d 370, 377 (D.C.Cir.1976). *Contra, Marcus Garvey Square, Inc. v. Winston, supra,* 595 F.2d at 1131–32; *DSI Corp. v. Secretary of Housing and Urban Development,* 594 F.2d 177, 179–80 (9th Cir. 1979); *Armor Elevator Co., Inc. v. Phoenix Urban Corp.,* 493 F.Supp. 876 (D.Mass.1980).

## 2. SOVEREIGN IMMUNITY

The second question is whether, as the Secretary contends, plaintiff's claims are barred by sovereign immunity. It is fundamental that the United States, as sovereign, is immune from suit except as it consents to be sued and that the terms of its consent to be sued in any court defines that court's jurisdiction to entertain the suit. *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941); *Ware v. United States,* 626 F.2d 1278, 1286 (5th Cir. 1980).

For the waiver of sovereign immunity, Johnson looks to Section 1 of the National Housing Act, as amended, 12 U.S.C. § 1702 (1976), which provides, in relevant part that:

The Secretary shall, in carrying out the provisions of . . . [*inter alia,* the National Housing Act], be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal.

In *Industrial Indem. Inc. v. Landrieu, supra,* the court held that the "sue and be sued" language of Section 1702 constitutes a qualified waiver of sovereign immunity in suits against the Secretary that relate to his duties under the National Housing Act. 615 F.2d at 646–647. A suit is against the Secretary, as opposed to a suit against the United States that could not be brought, if the judgment sought can be paid out of a "separate fund in the control and possession of the Secretary . . . that is severed from Treasury funds and Treasury control." *Id.; Southern Sog v. Roland, supra,* 644 F.2d at 379; *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947); *FHA v. Burr,* 309 U.S. 242, 250, 60 S.Ct. 488, 492–93, 84 L.Ed. 724 (1940); *S. S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 36 (2d Cir. 1979). In the instant case, a judgment against the secretary can be paid out of money in the Special Risk Insurance Fund, 12 U.S.C. § 1715z–3 which is a separate fund in the control and possession of the Secretary. *Trans-Bay Engineers and Build-*

---

**21.** There is authority to the effect that § 1702 couples a waiver of sovereign immunity and a grant of subject-matter jurisdiction to the federal district court. *Ferguson v. Union National Bank,* 126 F.2d 753 (4th Cir. 1942), *George H. Evans & Co. v. United States,* 169 F.2d 500, 502 (3rd Cir. 1948), *James T. Barnes & Co. v. Romney,* 334 F.Supp. 657 (E.D.Mich.1971). That approach, however, as discussed by the court in *Industrial Indem., Inc. v. Landrieu,* 615 F.2d 644, 647 (5th Cir. 1980) "confuses the waiver of sovereign immunity and a grant of subject matter jurisdiction. As we read 12 U.S.C. § 1702, it is plainly no more than a waiver of sovereign immunity and requires another statute to grant

jurisdiction in order to make a court competent to hear a case against the Secretary otherwise authorized by Section 1702."

**22.** Although never pleaded or properly invoked by plaintiff, jurisdiction could have been asserted additionally pursuant to 28 U.S.C. § 1337. *Winningham v. United States Department of Housing and Urban Development,* 512 F.2d 617, 621–23 (5th Cir. 1975); *Perry v. Housing Authority of City of Charleston,* 486 F.Supp. 498 (D.S.C.1980); *Lumberman's Underwriting Alliance v. Hills,* 413 F.Supp. 1193, 1197 (W.D.Mo. 1976).

ers Inc. v. Hills, supra, 179 U.S.App.D.C., 184, 551 F.2d 370, 376; S. S. Silberblatt, Inc. v. East Harlem Pilot Block, supra, 608 F.2d 28, 35 (2nd Cir.). See generally, Industrial Indem. Inc. v. Landrieu, supra, 615 F.2d at 646–647 (dictum). Contra, Marcus Garvey Square, Inc. v. Winston Burnett Construction Co., supra, 595 F.2d at 1130–31; DSI Corp. v. Secretary of HUD, supra, 594 F.2d at 179–80; Armor Elevator Co., Inc. v. Urban Corp., supra, 493 F.Supp. at 882–83.

Section 1702 by its own terms authorizes the Secretary to "sue and be sued" only when the lawsuit relates to the Secretary's duties in carrying out, inter alia, the provisions of the National Housing Act. Industrial Indem., Inc. v. Landrieu, supra, 615 F.2d at 647. See FHA v. Burr, supra, 309 U.S. at 248, 60 S.Ct. at 492. Not every act of the Secretary will give rise to a waiver of immunity simply because it was performed in his official capacity; those claims brought against the Secretary that allege acts wholly unrelated to the purposes of the National Housing Act are not contained within the waiver of immunity contained in Section 1702. See e.g., City of Sacramento v. Secretary of H. U. D. of Washington, D. C., 363 F.Supp. 736 (E.D.Cal.1972) (Section 1702 does not waive sovereign immunity to authorize a city's action seeking to condemn real property held in the name of the Secretary because the Secretary's actions in defending such a suit does not relate to his official duties in carrying out the provisions of the National Housing Act). In applying Section 1702, however, the Supreme Court has cautioned that the Secretary's amenability to be sued should be "liberally construed" and denied only in suits which are clearly "not consistent with the statutory or constitutional scheme." FHA v. Burr, supra, 309 U.S. at 245, 60 S.Ct. at 490. Johnson's claim that the Secretary improperly reduced the insurable mortgage for the Laurel Gardens project by finding that an identity of interest exists between Johnson and Ward clearly relates to the Secretary's

duties in carrying out the provisions of 12 U.S.C. § 1715z–1.

## 3. FEDERAL TORTS CLAIMS ACT

The seemingly broad waiver of immunity for actions brought against the Secretary in his official capacity under § 1702 is not absolute even when the source of damages sought by the claimant would not be the United States Treasury and the claim relates to the Secretary's duties in carrying out the provisions of the National Housing Act. Rather, the statutory authority "to sue and be sued" contained in Section 1702 is circumscribed, inter alia, by the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, in which Congress provided that claims sounding in tort brought against the United States are exclusively cognizable in the district courts under the FTCA. Bor-Son Bldg. Corp. v. Heller, 572 F.2d 174, 177 (8th Cir. 1978); Edelman v. F. H. A., 382 F.2d 594, 596 (2d Cir. 1967); DSI Corp. v. Secretary of HUD, supra, 594 F.2d at 180; United States v. Gregory Park Section II, Inc., 373 F.Supp. 317 (E.D.N.J.1974); Terrill Manor Associates v. United States Department of Housing, 496 F.Supp. 1118, 1121 (D.N.J.1980). The exclusivity principle of the FTCA is clearly stated in 28 U.S.C. § 2679(a):

> The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under Section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

This leads to the third threshold question whether, as the Secretary contends, Johnson's claim sounds in tort hence is controlled by the exclusivity provision of the FTCA. Johnson does not contest the Secretary's contention that to the extent that his claim sounds in tort, it is barred by the FTCA.[23]

23. While the federal district courts have been given exclusive jurisdiction over tort claims against the United States, that jurisdiction exists only when the statutory procedure for asserting such a claim has been followed. Initially, the FTCA waives sovereign immunity for claims against the United States and not the Secretary of HUD or HUD. But second, even if

In his complaint, Johnson alleges that the Secretary abused his discretion because "[t]he finding of an 'identity of interest' ... was erroneous, arbitrary and capricious and without basis in fact ..." Complaint ¶ 23. The Secretary contends that this claim, as pleaded, sounds in tort and must be dismissed.

Plaintiff has twice avoided the strictures of the FTCA in motions to dismiss and for summary judgment by characterizing his first claim, incorrectly, as one for unjust enrichment. Relying on *Trans-Bay Engineers and Builders, Inc. v. Hills, supra*, 179 U.S.App.D.C. 184, 551 F.2d 370, Johnson argues that the Secretary had an obligation to the plaintiff which was not rooted in contract but rather was based on equitable rights generated by the Secretary's course of dealing. 551 F.2d at 377.

*Trans-Bay Engineers* and its progeny[24] hold that a contractor of a low-income housing project, the mortgage for which is insured by HUD, can bring a claim for unjust enrichment in the district court against the Secretary to recover construction retainages withheld from the contractor. In each of these cases, the plaintiff contractor did not have an express contractual relationship with the Secretary. The nominal owner, however, with whom the contractor *did*

have an express contract was essentially the "creature of HUD"[25] used to effect a governmental program of low-income housing. Each of these cases is premised on the fact that the Secretary would be unjustly enriched or would benefit by the value of the contractor's uncompensated construction services if the contractor were denied a claim for relief.

Plaintiff's claim, which challenges the Secretary's actions in reducing the maximum insurable mortgage for the Laurel Gardens project is wholly unlike the contractor's claim for construction retainages. The chief distinction between the two types of claims is that Johnson, unlike the general contractor, *did* have an express contract with the Secretary out of which his claim arises. That contract is comprised of, *inter alia*, the Commitment for Insurance of Advances issued October 20, 1972 and the Building Loan Agreement, the Agreement & Certification and the Regulatory Agreement, all of which were executed April 19, 1973. In the Commitment for Insurance of Advances and the Agreement & Certification, the Secretary promised to insure the mortgage for the Laurel Gardens project in the amount of $1,057,100 subject to any reductions as provided in the National Housing Act and the regulations promul-

the instant suit were filed against the United States, the law is well-settled that the filing of an administrative claim with the appropriate federal agency is a jurisdictional prerequisite to the bringing of a suit against the United States for money damages. 28 U.S.C. § 2675(a); *Adams v. United States*, 615 F.2d 284, 285 (5th Cir. 1980); *Mack v. Alexander*, 575 F.2d 488, 489 (5th Cir. 1978). Plaintiff first filed suit against HUD on October 1, 1975, CA 75–3038, which he voluntarily dismissed on December 15, 1975. This first action did not satisfy the requirements of § 2675(a) of first presenting the claim to the appropriate federal agency." *Best Bearings Co. v. United States*, 463 F.2d 1177, 1179 (7th Cir. 1972).

Plaintiff did file an administrative claim with HUD on January 22, 1976, which claim was denied on February 25, 1976. 28 U.S.C. § 2401(b), the limitations provision applicable to tort claims brought against the United States pursuant to the FTCA, bars any such suits "... unless action is begun within six months after the date of mailing, by certified or registered mail, or notice of final denial of the claim by

the agency to which it was presented." Any claim plaintiff may have brought under the FTCA is barred because the instant action was not filed until December 15, 1977, or almost twenty-two months after his claim was denied by HUD.

24. *See e.g., Industrial Indem. Inc. v. Landrieu*, 615 F.2d 644 (5th Cir. 1980); *S. S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28 (2d Cir. 1979); *Spring Construction Co., Inc. v. Harris*, 562 F.2d 933 (4th Cir. 1977); *United States v. Mill Ass'n, Inc.*, 480 F.Supp. 3 (E.D.N.Y.1978); *F. W. Eversley & Co. v. East N. Y. Non-Profit HDFC*, 409 F.Supp. 791 (S.D.N.Y. 1976); *Bennett Construction Co. v. Allen Gardens, Inc.*, 433 F.Supp. 825 (W.D.Mo.1977); *Am. Fidelity Fire Ins. Co. v. Construcciones Werl*, 407 F.Supp. 164 (D.V.I.1975).

25. *F. W. Eversley & Co. v. East N. Y. Non-Profit HDPC*, 409 F.Supp. 791, 797 (S.D.N.Y.1976); *Bennett Construction Co. v. Allen Gardens, Inc.*, 433 F.Supp. 825, 835 (W.D.Mo.1977).

gated pursuant thereto. If, as Johnson contends, the Secretary acted tortiously by reducing the insurable maximum mortgage for the Laurel Gardens project, his claim is properly characterized as one for tortious breach of contract because the activity about which Johnson complains is the subject of a promise made by the Secretary pursuant to an express contract. *Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, 947 (D.C.Cir.1975); *Woodbury v. United States*, 313 F.2d 291, 295 (9th Cir. 1963); *Herder Truck Lines v. United States*, 335 F.2d 261 (5th Cir. 1964); *United States v. Smith*, 324 F.2d 622 (5th Cir. 1963); *Putnam Mills, Inc. v. United States*, 432 F.2d 553 (2d Cir. 1970). Since Johnson's identity of interest claim is in substance a breach of contract claim, it clearly falls outside the reach of the FTCA. *See Blanchard v. St. Paul Fire and Marine Insurance Co.*, 341 F.2d 351 (5th Cir. 1965).

### 4. TUCKER ACT

The fourth and final threshold question is whether the Tucker Act, 28 U.S.C. § 1346(a)(2) (1976), bars plaintiff's *contract* claim. That section states, in pertinent part:

> The district courts shall have original jurisdiction, concurrent with the court of claims of; ... (2) any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Ordinarily, persons suing the United States or a federal agency on a contract claim rely on the Tucker Act for the waiver of sovereign immunity that would otherwise preclude their suits. Hence it is commonly said that suits against the government founded upon claims not sounding in tort to recover sums in excess of $10,000 are exclusively vested in the Court of Claims.

■ The Tucker Act, however, is inapplicable to Johnson's first claim because the judgment would be paid out of a separate fund within the control of the Secretary and HUD. Accordingly, the claim is against the Secretary and not the United States. *See* Part I. C. 2 of this opinion. It is clear that if this claim had been brought *pursuant to the Tucker Act*, the Court of Claims would have exclusive jurisdiction. *Graham v. Henegar*, 640 F.2d 732 (5th Cir. 1981); *Ware v. United States*, 626 F.2d 1278, 1280 (5th Cir. 1980); *A. L. Rowan & Son, Etc. v. Dept. of Housing*, 611 F.2d 997 (5th Cir. 1980); *Blanchard v. St. Paul Fire and Marine Insurance Co., supra*, 341 F.2d 351. Since Johnson does not rely on the Tucker Act to establish a waiver of sovereign immunity, he is not subject to the limitations of that Act, which restrict the subject-matter jurisdiction of the district courts. *Graham v. Henegar, supra*, 640 F.2d at 734–35 n. 6; *Bor-Son Building Corporation v. Heller, supra*, 572 F.2d at 182 n. 14; *Trans-Bay Engineers and Builders, Inc. v. Hills, supra*, 551 F.2d at 376; *Bennett Construction Co., Inc. v. Allen Gardens, Inc.*, 433 F.Supp. 825, 831 (W.D.Mo.1977); *Ghent v. Lynn*, 392 F.Supp. 879 (D.Conn. 1975). *Contra, Armor Elevator Co., Inc. v. Phoenix Urban Corporation, supra*, 493 F.Supp. at 876.

### D. REAL PARTY IN INTEREST

■ Before considering the issue of damages, I feel compelled to raise on my own motion a fifth threshold question regarding the jurisdiction of this court to entertain this suit by Johnson in the face of the Real Party in Interest Rule, F.R.C.P. 17(a). That rule states that "every action shall be prosecuted in the name of the real party in interest." The effect of this provision is that a party has standing to prosecute a suit in federal court only if he is the "real party in interest." *United States v. 936.71 Acres of Land, State of Florida*, 418 F.2d 551, 556 (5th Cir. 1969). The real party in interest is the person who, according to the governing substantive law is entitled to enforce the right. *Id.*; 6 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 1543, p. 643 (1971). At

the time the real party in interest rule was incorporated into the Federal Rules, Professor Moore stated of the rule:

> Its meaning perhaps would be more accurately expressed if it read: An action shall be prosecuted in the name of the party, who, by substantive law, has the right sought to be enforced. Moore, Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft, 1937 Geo.L.J. 551, 564.

Under Louisiana law, as long as the partnership exists and has not been dissolved or liquidated, it alone can maintain an action on a partnership claim; a partner cannot, in his individual capacity, bring suit to recover a debt or damages owed to the partnership. *Coast v. Hunt Oil Co.*, 195 F.2d 870, 871 (5th Cir. 1952); *Dalby v. United States Fidelity & Guaranty Co.*, 365 So.2d 568 (La.App.1978); *Apex Sales Company v. Abraham*, 201 So.2d 184, 187 (La. App.1967). The Supreme Court of Louisiana stated the rule succinctly in *E. B. Hayes Machinery Co. v. Eastham*, 147 La. 347, 84 So. 898, 899–90 (1920):

> Under the civil law, which prevails in this state, a partnership is a legal entity entirely separate and distinct from the persons who compose it, and may have its own creditors and debtors to the same extent as the individual partners. [citations omitted]. So long as the partnership is not dissolved, it alone can maintain an action on the firm's claims, and even though all its members join therein, such a suit cannot be maintained in the absence of the partnership as a party plaintiff. [citations omitted].

Although Johnson is a partner of Laurel Gardens, under Louisiana law, he has no power to champion the rights of the partnership, which alone possesses the substantive right to complain that the Secretary improperly reduced the mortgage for the Laurel Gardens project. As a result, Johnson's first claim fails to state a claim upon which relief may be granted because Johnson is entitled to no relief. Rule 17(a), however, states that:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed *after objection* for ... substitution of, the real party in interest; and such ... substitution shall have the same effect as if the action had been commenced in the name of the real party in interest. [emphasis added].

As already stated, the Government has never raised this objection and at this late hour, I find that it has been waived. *Marston v. American Employers Ins. Co.*, 439 F.2d 1035, 1041 (1st Cir. 1971). Both parties knew who the real party in interest was and what its claims were. Accordingly, I will grant the plaintiff leave to amend his complaint to substitute the proper party, Laurel Gardens, a Partnership in Commendam, as plaintiff. If the plaintiff refuses to amend his complaint to name Laurel Gardens as plaintiff, I will dismiss, *sua sponte*, plaintiff's first claim for lack of standing and failure to state a claim for relief. *See Schaeffer v. Sharp*, 328 F.Supp. 762, 764 (S.D.Miss.1971) (three-judge court) (action seeking to enjoin distribution among all counties of excise tax funds collected by and belonging to the state dismissed *sua sponte* because plaintiffs did not constitute real parties in interest entitled to institute and maintain the action).

E. MERITS

24 C.F.R. § 221.551 provides that the Secretary may require a mortgagor to submit a certification of actual cost for each subcontractor with which the mortgagor has an identity of interest. The Agreement and Certification executed between Laurel Gardens, BNO and the Secretary provides in ¶ 9 that for purposes of determining actual cost:

> No profit or general overhead may be included in the subcontract unless the [Secretary] has in advance granted approval in writing of the subcontract and has approved a specific dollar amount or a specific percentage for profit and/or general overhead.

This provision authorizes the Secretary to reduce the mortgagor's final insurable mortgage by those amounts attributable to the subcontract's profit and/or general overhead when an identity of interest exists between the mortgagor and a subcontractor and prior approval has not been obtained for the subcontract.

Although the applicable regulations make distinctions between identity of interest and non-identity of interest relationships between the mortgagor, general contractor and subcontractors, the only statutory, regulatory or contractual definition for the term "identity of interest" is found in ¶ 5 of the Agreement and Certification. That provision equates an identity of interest with any "financial interest" or "family relationship" which exists between the mortgagor and the general contractor or any subcontractor.[26] Laurel Gardens certified that an identity of interest existed between it and "Lewis E. Johnson, Builder, as General Contractor; none as to all others".

Even without defining "identity of interest", Section 1715r and the applicable regulations make clear that the identity of interest concept is designed to limit a § 236

mortgage to a maximum insurable amount that includes only reasonable allowances for profit and risk for the mortgagor and the builder. When the mortgagor (sponsor) of the project is also the builder (i.e., an identity of interest exists between the mortgagor and the builder), as in the instant case, the mortgagor must enter into a cost-plus contract with the builder, 24 C.F.R. § 221.-548(c), and the mortgagor's certificate of actual cost, 24 C.F.R. § 221.550, may include a builder's and sponsor's profit and risk allowance of up to 10% of the actual cost. 24 C.F.R. § 221.550a(b). When no identity of interest exists between the mortgagor and the builder, the mortgagor may enter into the lump sum construction contract with the general contractor, 24 C.F.R. § 221.548(b), which may include a reasonable builder's fee approved by the Secretary. 24 C.F.R. § 221.550(b)(1). In computing the actual cost of the project upon which the mortgagor may include a 10% sponsor's profit and risk allowance, however, the amounts paid by the mortgagor under the lump sum construction contract are excluded. 24 C.F.R. § 221.-551a(c)(1). This precludes the mortgagor

26. The full text of ¶ 5 provides: "Mortgagor certifies that the financial interests or family relationships which exist between Mortgagor and any of its officers, directors, or stockholders with the Architect and with the General Contractor, subcontractors, suppliers, or equipment lessors are:".

The record contains two additional official HUD definitions of "identity of interest". HUD Handbook 4450.1, ¶ 6–5, page 6–9 (revised November, 1972) (Defendant's Exhibit G–2) states:

"Identity of Interest" means any relationship which would give the general contractor control or influence over the price paid to the subcontractor. Usually this would be by the general contractor having a financial interest in the subcontractor, but it could be by other means, such as a family relationship.

The Mortgagor's Certificate of Actual Cost, FHA Form 2330 (Plaintiff's Exhibit P–36) provides:

Identity of interest between the mortgagor and/or sponsor as parties of the first part and general contractors, subcontractors, material suppliers, or equipment lessors as parties of the second part will be construed as existing under any of the following conditions:

When there is any financial interest of the party of the first part in the party of the second part; when one or more of the officers, directors or stockholders of the party of the first part is also an officer, director, or stockholder of the party of the second part; when any officer, director or stockholder of the party of the first part has any financial interest whatsoever in the party of the second part; when the party of the second part advances any funds to the party of the first part; when the party of the second part provides and pays on behalf of the party of the first part the cost of any architectural services or engineering services other than those of a surveyor, general superintendent, or engineer employed by a general contractor in connection with his or its obligations under the construction contract; when the party of the second part takes stock or any interest in the party of the first part as part of the consideration to be paid them; when there exists or come into being any side deals, agreements, contracts or undertakings entered into or contemplated, thereby altering, amending, or cancelling, any of the required closing documents except as approved by the Commissioner.

from profiting on the services of the contractor for which the mortgagor has no right to profit. Similarly, the mortgagor is additionally precluded from profiting or benefiting from subcontracts. *See* 24 C.F.R. §§ 221.549 and 221.551.

The statutory and regulatory scheme suggests that an identity of interest exists between the mortgagor and the builder, the builder and a subcontractor or the mortgagor and a subcontractor whenever one or both benefits from the proceeds of the other or when the parties have reason to contract on other than an arm's length basis. As already stated the "identity of interest" regulations further the statutory requirement of § 227, which limits the sponsor's and builder's profit and risk allowances to a reasonable amount, usually 10% of the estimated actual cost of the project. So for example, in the instant case, the Secretary issued a Commitment to Insure 90% of the $1,174,643 replacement cost of the Laurel Gardens project or $1,057,100. That sum was based on estimates which indicated that the actual construction costs would equal $804,760 and Laurel Gardens, the mortgagor would be entitled to a builder's and sponsor's profit and risk allowance of $93,268. Johnson, the general contractor, subcontracted all of the work on the project to subcontractors whose subcontract prices presumably included amounts for profit and general overhead. Without the identity of interest rules, Johnson as well as other builders having an identity of interest with the mortgagor, could effectively receive indirectly a greater profit and risk allowance by entering into inflated subcontracts with identity of interest subcontractors and sharing in the profits of those subcontracts. The Agreement and Certification, which authorizes the Secretary to disallow identity of interest subcontract costs for profit and general overhead, removes the incentive for a mortgagor/builder to so artificially increase the estimated and actual construction costs of a § 236 project and additionally gives the Secretary a weapon to offset such unauthorized costs.

The Dallas Regional Office made the identity of interest finding at issue in this case based on the cost certification documents submitted by Laurel Gardens, which documents indicated that Johnson, a co-sponsor and the builder of the project, and Ward, a subcontractor, jointly executed a promissory note to obtain funds to complete the purchase of the land for the project. The Dallas Regional Office concluded that the promissory note created a financial interest between Johnson and Ward, not unlike a joint venture, thereby creating an identity of interest. Accordingly, Ward was required to submit a certificate of actual costs and the insurable mortgage was reduced by an amount that the Dallas Regional Office determined approximated the profit and general overhead received by Ward's Packaged Homes under the subcontract.[27]

The circumstances surrounding the execution of the promissory note, upon which the identity of interest finding was made, highlights the fallacy of the Secretary's determination. As set forth earlier, HUD/NOAO rejected Ward as a co-sponsor of the Laurel Gardens project only days before the Commitment to Insure was set to expire. Ward, however, was confident that he could convince HUD/NOAO to reverse that decision. During this state of uncertainty, Johnson and Ward had no alternative, due to the limited amount of time before which the Secretary's commitment would expire, except to make all of the arrangements necessary for the initial closing of the project.

The Secretary cannot insure a § 236 project mortgage unless the property constituting the security for the mortgage is held by the mortgagor at the time the mortgage is insured free and clear of all liens. 24 C.F.R. § 221.544(b). Johnson owned only a portion of the property; the rest of the property was held by the estate of Orr for which Johnson served as executor. To satisfy the property requirement, Johnson and Ward borrowed $117,000 to

---

**27.** *See* n. 16, *supra*.

complete the purchase of the property owned by the estate of Orr and executed a promissory note in favor of BNO. Armstrong agreed that it is normal for § 236 sponsors to make financial arrangements of this kind in contemplation of initial closing. (T–350). At the same time, Johnson and Ward recognized the possibility that Ward would not be approved as a sponsor. In that event, Ward wished to have no liability under the promissory note. In contemplation of this contingency, Johnson and Ward executed an agreement in which Johnson agreed to "do all that is necessary to remove" Ward from the promissory note if their agreement "relative to their respective interests and obligations in the Laurel Gardens" project was not consummated on or before April 23, 1973.[28] By this agreement, Johnson intended to release Ward from any obligation on the promissory note if HUD/NOAO rejected Ward finally as a sponsor of the Laurel Gardens project. It has never been contended by the Secretary, nor would it be relevant, that the agreement did not constitute a legally effective release.

At the time Morgan adopted the determination made by his staff that an identity of interest exists between Johnson and Ward, neither Morgan nor any member of his staff had any knowledge of the release agreement or of the facts recited above necessary to fully appreciate the circumstances surrounding the execution of the promissory note. May of BNO, the mortgagee, and Johnson learned of the identity of interest finding and its resulting consequences, after Morgan had referred the matter back to HUD/NOAO. Accordingly, May's and Morrow's letters, which for the first time apprised HUD of the release agreement, were directed to Armstrong of HUD/NOAO and not Morgan of the Dallas Regional Office. These efforts proved fruitless, however, and despite this new and significant information Armstrong refused to recommend to the regional office that it reverse or even reconsider its finding. Armstrong's failure to forward any of the newly acquired information to the Dallas Regional Office gave Morgan's staff no opportunity to consider the effect and the validity of the release agreement and the time frame relative to initial closing and the circumstances under which the note was executed.[29]

28. Since the date on which the Commitment to Insure expired fell on Good Friday (April 20, 1973), Johnson and Ward evidently chose the date of April 23 on the mistaken belief that the Commitment might continue to be effective until Monday, April 23. *See* Plaintiff's Exhibit P–54.

29. Robert Jaggers, the principal cost advisor to Guy Seegers, Assistant Regional Administrator for Housing Production and Mortgage Credit, first made the identity of interest finding at the Dallas Regional Office. His joint recommendation, concurred in by his superiors, was ultimately adopted by Morgan. At trial, Jaggers testified, upon questioning by the Court, that if Ward's obligations on the promissory note had been fully discharged prior to initial closing, Jaggers would not have found a financial relationship sufficient to constitute an identity of interest between Johnson and Ward. (T–607–608):

THE COURT: Well, Mr. Ward was not approved as a sponsor by your office because he was having some trouble in another job that FHA was involved in.

So Mr. Johnson and Mr. Ward had an agreement, and it's in the record here, that if Mr. Ward was not a sponsor, he couldn't be a sponsor, then he would have no obligations under the note.

If you had known that, would that have made an identity of interest to you? Would that still have been an identity of interest?

THE WITNESS: I would certainly have reviewed that document. It is my opinion right now that I would have made the same finding that I found. That relationship that existed at that point in time, in my opinion, does constitute an identity of interest.

THE COURT: Because the original money went into the project?

THE WITNESS: Yes, sir.

THE COURT: And there was no—Mr. Ward had not taken himself out of it completely. If Mr. Ward had been discharged on that note, would that have made any difference, and you have proof that he was no longer obligated under that note at all, would that have made any difference?

THE WITNESS: Yes, sir. Had that happened, I would have not picked the information that there was the relationship.

THE COURT: You would not have, would you?

THE WITNESS: No sir.

THE COURT: And you would have had no basis to do it?

THE WITNESS: That is correct.

■ The regulations promulgated by the Department of Housing and Urban Development provide no administrative framework in which to appeal the decisions of the area offices to the regional office or to appeal the decisions of the regional offices to the Office of Assistant Secretary for Housing under which the § 236 program is organized. Accordingly, the identity of interest finding made by the Dallas Regional Office represents HUD's final determination; the agency's final action on the matter was Armstrong's refusal to recommend to the Dallas Regional Office that it reverse or reconsider its determination. I conclude that the Secretary's final determination that the promissory note created or evidenced an identity of interest between Johnson and Ward was arbitrary, capricious and erroneous because the facts, which clearly indicate that Johnson released Ward from any liability under the note even before the initial closing of the project, provide no basis upon which to predicate such a finding.

## F. DAMAGES

### 1. INTEREST REDUCTION PAYMENTS

■ Based on the Secretary's agreement to insure, BNO agreed to lend Laurel Gardens $1,057,100 which amount would be reduced by any amount required by the Mortgagor's Certificate of Actual Cost. The Secretary's identity of interest finding resulted in disallowances totaling $40,376 from the Mortgagor's Certification of Actual Cost.[30] Consequently, the Secretary reduced the insurable mortgage for the Laurel Gardens project from $1,034,100 to $997,700.[31] Johnson contends that he is entitled to recover the amount improperly disallowed from the Mortgagor's Certificate of Actual Cost or $40,376. This contention is incorrect for two reasons. First, the figure is incorrect because the mortgage loan was reduced by 90% of $40,376 or $36,400. Second, and more fundamentally, the Secretary, pursuant to § 236 does not make mortgage loans; he only makes interest reduction payments to a lender on behalf of a project owner. 12 U.S.C. § 1715z–1(c). As a result of the Secretary's actions, BNO reduced the mortgage *loan* for the project by $36,400 and Laurel Gardens was deprived of the *interest reduction payments* the Secretary would have been required to make on that amount. Regardless whether Laurel Gardens borrowed other monies to account for the reduction in the project's mortgage loan, Laurel Gardens is entitled to recover from the Secretary a sum equal to the amount of *interest reduction payments* the Secretary would have made on

**30.** *See* n. 19, *supra.*

**31.** Had the Secretary not disallowed $40,376 from the Mortgagor's Certificate of Actual

Cost, the Maximum Insurable Mortgage (Plaintiff's Exhibit P–69, *see* n. 20, *supra*) should have been calculated as follows:

| | | | |
|---|---|---|---|
| 1. | (a) Original Mortgage Amount | | $ 1,057,100 |
| | (b) Less: Minus Effect of Construction Changes, if any | $. (44,928) | |
| | (c) Unused Contingency Reserve, if any (Rehabilitation) | $. . . .-. . | |
| | (d) Total Deductions from Original Mortgage Amount | | $ (44,928) |
| | (e) Adjusted Original Mortgage Amount | | $. 1,012,172 . . |
| 2. | Certified "Actual Cost" (From FHA Form 2330) | $ .1,035,793. . . | |
| 3. | Disallowed Amounts (Schedule 1) | $ 35,513 | |
| 4. | Recognized "Actual Cost" of Improvements | $ .1,000,280. . . | |
| 5. | Land (Schedule 2) | $ 148,700 | |
| 6. | TOTAL LAND & IMPROVEMENTS | $ 1,148,980 | |
| 7. | Statutory Percentage of Total Cost ( 90 % of Item 6) | $ .1,034,062. . . | |
| 8. | Lesser of: (i) $_____ Existing Mortgage Indebtedness on (Land and Improvements to be Rehabilitated) or (ii) an Amount Equal to ____% of the Fair Market Value $_____ of Land and Improvements Before (Repair or Rehabilitation) | $____ - | |
| 9. | TOTAL – Line 7 plus Line 8, (if any) | | $ .1,034,062. . . |
| 10. | Maximum Insurable Mortgage in Multiples of $100, (Item 1(e) or Item 9 whichever is the Lesser) if Grants involved see Reverse Side of this Form for Reconciliation of Adjustments, if Required | | $ 1,034,100 |

the $36,400 mortgage loan reduction to BNO on behalf of Laurel Gardens.

## 2. COST OF WARD'S COST CERTIFICATION

In his post-trial brief on damages, Johnson asserts a claim for $3,000 which allegedly represents the cost of obtaining the cost certification for Ward's Packaged Homes, Inc. required by the Secretary as a result of the identity of interest determination. Plaintiff's brief references nothing from the testimony presented at trial or the exhibits introduced into evidence in support of this claim. The record in this matter does contain one reference to this cost. In his deposition, Elliott stated that "Johnson had to pay [the accountant] something like $3,000 towards [Ward's] cost certification just to get the thing closed." (Elliott Depo. at 188).

 It is plaintiff's burden to prove those damages he has actually sustained. *Louisiana Power & Light Co. v. Sutherland Specialty Co.*, 194 F.2d 586, 587 (5th Cir. 1952); *SFI, Inc. v. United States Fire Ins. Co.*, 453 F.Supp. 502, 507 (M.D.La.1978). They cannot be merely speculative or conjectural. *Nat Harrison Associates, Inc. v. Gulf States Utilities, Co.*, 491 F.2d 578 (5th Cir. 1974). I find that the single, isolated statement contained in Elliott's deposition is insufficient to sustain (1) the fact that this cost was actually incurred by either Johnson or Laurel Gardens or (2) that $3,000 accurately represents the amount of the purported cost with any degree of certainty or precision.

## 3. CONSEQUENTIAL DAMAGES

To encourage maximum participation by private investors in programs and projects designed to provide housing for low and moderate income families, Congress authorized, in 1968, the creation of a private corporation for profit which could build, rehabilitate, buy, own, manage, lease and otherwise acquire and dispose of housing, development projects and other related fa-

cilities. 42 U.S.C. §§ 3931 *et seq.* That corporation, known as the National Corporation for Housing Partnerships ("NCHP"), a District of Columbia corporation was additionally authorized to form, as a separate organization, a limited partnership, now known as the National Housing Partnership ("NHP"), a District of Columbia limited partnership.

On January 11, 1974, Johnson and Potter entered into a purchase agreement with the NCHP and the NHP in which Johnson and Potter agreed to transfer a 99% interest in Laurel Gardens to the NCHP and the NHP. Contemporaneously with the execution of the purchase agreement, Potter transferred whatever remaining interest he owned in Laurel Gardens to Johnson. As a result of these transactions effective January 11, 1974, the transfer date under the purchase agreement, Johnson remains a general partner of Laurel Gardens and owns a 1% interest; the NCHP owns a 1% interest as a general partner; and the NHP owns a 98% interest as a partner in commendam. The purchase agreement provided that the price of the purchased interest would equal 10.03% of 99% of the mortgage loan authorized by the Secretary for final endorsement for insurance, but not in excess of $105,000.

As previously stated, the Secretary improperly reduced the mortgage loan amount by $36,400. As a result, the purchase price of the 99% interest in Laurel Gardens acquired by the NCHP and NHP was reduced by $3,614.41.[32] Johnson contends that he is entitled to recover this amount from the Secretary as a consequence of his actions.

 It is a familiar rule that damages for breach of contract are limited only to those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. 5 A. Corbin, On Contracts, § 1007, p. 70 (1964); *Hadley v. Baxendale*, 9 Exch. 341 (1854); *Primrose v. Western Union Tel. Co.*, 154 U.S. 1, 29, 14 S.Ct. 1098, 1106, 38 L.Ed. 883

---

**32.** Johnson erroneously calculated the reduction to be $4,157.65 by applying the purchase price formula to the amount disallowed instead of the mortgage loan reduction figure.

(1894). There is no evidence in the record from which to infer that at the time the Secretary agreed to insure the loan for the Laurel Gardens project that he could reasonably have contemplated that the persons holding interests in Laurel Gardens would transfer their interest prior to final endorsement for a price dependent upon the insurable mortgage loan finally determined by the Secretary. Even at the time of final endorsement, assuming that the Secretary had knowledge that Johnson had transferred a significant part of his interest in Laurel Gardens to the NCHP and the NHP, Johnson presented no evidence to suggest that the Secretary knew or should have known that the purchase price of the transferred interest would ultimately equal a prescribed proportion of the mortgage loan authorized for final endorsement for insurance. Accordingly, I find that this claim for damages is too remote to the Secretary's breach of contract and is denied.

## II. CHANGE ORDER CLAIMS

In his second claim, Johnson alleges that the Secretary arbitrarily refused to approve certain change order requests, despite his agent's representations to the contrary. On April 16, 1973 and prior to initial closing, Elliott met with Lionel Trosclair, then cost analyst and Chief of the Cost Evaluation Section, HUD/NOAO, to discuss, *inter alia*, FHA Form No. 2328, the Contractor's and/or Mortgagor's Cost Breakdown ("cost breakdown"). Elliott advised Trosclair that the cost breakdown prepared by the original sponsors of the project (Sherman and Potter) and submitted on behalf of Laurel Gardens was no longer accurate and required certain line item adjustments. Trosclair responded that the cost breakdown could not be re-analyzed prior to the expiration of the Commitment to Insure, which could not be extended. Plaintiff contends, and I so find that Trosclair assured plaintiff through Elliott that if the bottom line estimated cost of the project ($804,769) remained the same, the cost breakdown would later be revised after construction was in progress to reflect those line item adjustments.

On June 14, BNO requested on behalf of Laurel Gardens that HUD/NOAO revise the approved cost breakdown originally submitted by Sherman and Potter in accordance with the line item changes itemized in BNO's letter of that date. The proposed changes, which increased eight line items by a total amount of $91,254 while decreasing seven line items by the same total amount [33] left unchanged the total estimated cost for all improvements. Ordinarily, cost breakdown items are revised pursuant to FHA Form No. 2437, Request for Construction Changes—Project Mortgages. Only the sponsor's request to reduce the estimated cost for line Item 1—concrete—was submitted additionally on FHA Form No. 2437.[34] According to May, HUD/NOAO did not request that he submit the change orders on the appropriate form, hence he submitted them by letter.

**33.**

| Trade Item | Net Change | Trade Item | Net Change |
|---|---|---|---|
| Line 1 – Concrete Reduced from $91,370 to $47,623 | $ –43,747 | Line 24 – Blinds and Shades Increased from $8,000 to $19,800 | + 11,800 |
| Line 2 – Masonry Reduced from $40,790 to $22,390 | –18,400 | Line 25 – Carpets Increased from $20,000 to $41,000 | + 21,000 |
| Line 6 – Termiting Reduced from $2,000 to None | –2,000 | Line 28 – Plumbing and Hot Water Reduced from $85,000 to $76,829 | –8,171 |
| Line 9 – Sheet Metal Reduced from $6,000 to $5,000 | –1,000 | Line 29 – Heat and Ventilation Increased from $33,200 to $36,000 | + 2,800 |
| Line 14 – Drywall Reduced from $45,450 to $36,330 | –9,120 | Line 30 – Air Conditioning Increased from $12,300 to $15,600 | + 3,300 |
| Line 15 – Tile Work Increased from $4,900 to $14,865 | + 9,965 | Line 31 – Electrical Reduced from $46,000 to $37,154 | –8,846 |
| Line 19 – Painting and Decorating Increased from $13,550 to $27,634 | + 14,084 | Line 35 – Site Utilities Increased from $5,000 to $11,163 | + 6,163 |
| Line 22 – Cabinets Increased from $14,000 to $36,172 | + 22,172 | | |

**34.** Plaintiff's Exhibit P–82.

HUD/NOAO did not act on Laurel Gardens' request to revise the cost breakdown submitted by BNO, except with respect to Line Item No. 1—concrete. Ultimately HUD/NOAO recognized five change orders which had a cumulative effect of reducing the estimated construction cost by $44,928.[35]

Johnson contends that as a result of the Secretary's failure to approve the change order requests itemized in n.33, the Secretary disallowed the following amounts: (1) $881 (reduction in contractor's general overhead) and (2) $5,063 (reduction in general requirements as excessive clean-up costs).[36] Johnson has offered no evidence to explain how the Secretary's failure to approve change order requests resulted in these two disallowances. Neither of these items were the subject of a change order request. Essentially, Johnson has isolated two of many disallowances and has simply contended that the amounts were improperly disallowed without any plausible explanation for this claim. This claim fails for lack of proof and for a lack of any legal basis upon which this Court should grant relief.[37]

**35.** Plaintiff's Exhibit P–41 indicates that the following change order requests were approved by HUD/NOAO: (1) Line Item No. 1, concrete, –$43,747; (2) Line Item No. 10, doors, –$600; (3) Line Item 23, appliances, –$36; (4) Line Item No. 42, general requirements, –$864; and (5) Line Item 44, builder's overhead, –$881.

**36.** Johnson did not specify, but these amounts were disallowed from the Mortgagor's Certificate of Actual Costs.

**37.** This claim appears to have mixed apples and oranges resulting in an unpalatable blend. Starting with Johnson's first premise, however, which I find the evidence to support, Johnson did state a potential claim but introduced no evidence to support it. I believe that Trosclair did state that he would approve a revised cost breakdown to reflect the line item changes proffered by Elliott so long as the estimated cost of the project would remain $804,760. There is no evidence to indicate that the line item changes requested prior to initial closing were actually the same ones requested by Laurel Gardens in BNO's letter of June 14 (see n. 34, *supra* ). Assuming they were the same, had Trosclair approved those line item changes, the cumulative effect of all of the change orders would have reduced the estimated construction cost by only $1,181 instead of $44,928. (This figure is calculated as follows: Plaintiff's Exhibit P–41 indicates that HUD/NOAO, Cost Section adjusted the contractor's construction cost estimate to account for the effect of change orders. The listed change orders had a minus effect of –$45,528 and a plus effect of +

$600 for an overall minus effect of –$44,928. Hence the contractor's estimated construction cost was reduced from $804,760 to $759,832. Plaintiff's Exhibit P–42. Had the change order request items in BNO's letter of June 14 been used in the calculus, the minus change orders would have equalled –$93,065 while the plus change orders would have equalled + $91,884. The cumulative effect would have been –$1,181.) The minus effect of change orders is significant to the calculation of the mortgage loan authorized for final endorsement for insurance. As indicated at n. 20, *supra*, the Secretary will approve a mortgage loan for an amount which is the lesser of (1) the original mortgage amount less the minus effect of construction changes and unused contingency reserves or (2) 90% of the recognized actual cost of improvements plus the allowable land cost. Substituting the $1,181 amount for the $44,928 figure which was used by the Secretary in calculating the mortgage loan amount, the original mortgage amount of $1,057,100 would have been reduced to $1,055,919 instead of $1,012,172. This, however, was not the claim asserted by Johnson. His claim, as presented, suggested that the two amounts were improperly "disallowed", hence reduced the recognized "actual cost of improvements" thereby ultimately effecting the figure for "Total Land & Improvements". Moreover, even if Johnson had asserted the foregoing described claim, since the final mortgage loan amount represents the *lesser* of the two figures, the mortgage loan would have remained $1,034,100:

| | | |
|---|---|---|
| 1. (a) Original Mortgage Amount | | $ 1,057,100 |
| (b) Less: Minus Effect of Construction Changes, if any | $. (44,928) | |
| (c) Unused Contingency Reserve, if any (Rehabilitation) | $. . . .÷. . . | |
| (d) Total Deductions from Original Mortgage Amount | | $ 1,181 |
| (e) Adjusted Original Mortgage Amount | | $ 1,055,919 |
| 2. Certified "Actual Cost" (From FHA Form 2330) | $ .1,035,793 . . | |
| 3. Disallowed Amounts (Schedule 1) | $ 35,513 | |
| 4. Recognized "Actual Cost" of Improvements | $ 1,000,280. . . | |
| 5. Land (Schedule 2) | $ 148,700 | |
| 6. TOTAL LAND & IMPROVEMENTS | $ 1,148,980 | |
| 7. Statutory Percentage of Total Cost ( 90 % of Item 6) | $ .1,034,062. . | |

## III. MISREPRESENTATION CLAIM

Ward's suit against Johnson came for trial on December 10, 1974. On that date, Johnson's attorney, John Maxwell, subpoenaed several officials of HUD/NOAO to appear to testify. Johnson and Maxwell agreed, however, at Armstrong's request, to allow Geyer to appear as the sole witness and representative of HUD/NOAO after Armstrong assured Maxwell that Geyer was fully acquainted with the matter and had the authority to make any necessary decisions on behalf of HUD/NOAO. Prior to trial, the parties engaged in settlement discussions. Johnson claims that during those discussions, Geyer represented that final endorsement for the Laurel Gardens project would be forthcoming in only two to three weeks. Based on Geyer's assurances, Laurel Gardens and Johnson, "in solido", consented to judgment in the amount of $123,100. The consent judgment included attorney's fees and costs of $10,424.82 greater than the $112,675.18 amount Johnson had withheld from Ward under the subcontract, as of the day of trial. Johnson contends that he would not have consented to judgment, incurring an additional $10,424.82 of liability to Ward had Geyer not made the representations described above.

The gravamen of this claim is that Johnson consented to judgment in Ward's suit against him in reliance upon Geyer's assurances that approval of the cost certification and final endorsement for the Laurel Gardens project would be forthcoming. This claim clearly is one to recover damages for misrepresentation which is barred by the FTCA.[38]

Even if Johnson had properly instituted suit under the FTCA, this claim would have been barred by sovereign immunity because the United States has not consented to suits seeking damages for misrepresentation. 28 U.S.C. § 2680(h). *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961).

## IV. HOUSING MANAGEMENT AGREEMENT CLAIM

In addition to being a sponsor and the general contractor of the Laurel Gardens project, Johnson also acted as the managing agent through his wholly-owned business, Park Manor Homes. On March 3, 1973, a housing management agreement was executed between Laurel Gardens and Park Manor Homes, which was approved by Herman J. Duncan, Jr., then Director of Housing Management Division, HUD/NOAO on April 18, 1973. Pursuant to that agreement, Park Manor Homes received a monthly management fee of 6% of the gross basic rent collected from the Laurel Gardens project dwelling units. The agreement provided for a one year term beginning on December 1, 1973 and ending on November 30, 1974. That agreement expired according to its own terms on November 30, 1974. Thereafter, Park Manor Homes continued to manage the project at the expired contract rate of 6%.

Sometime in October, 1976, Elliott and Johnson met with Michael Mills, Realty Loan Specialist, Housing Management Division, HUD/NOAO and Duncan to negotiate a new contract which would increase the management fee to at least 9% as well as compensate Park Manor Homes for certain reasonable monthly expenses. On April 19, 1977 Duncan approved a two-year housing management contract, executed between Park Manor Homes and Laurel Gardens, effective retroactively from January 1, 1977, which agreement provided for a 9.75% management fee.

---

8. Lesser of: (i) $_____ Existing Mortgage Indebtedness on (Land and Improvements to be Rehabilitated) or (ii) an Amount Equal to _____% of the Fair Market Value $_____ of Land and Improvements Before (Repair or Rehabilitation) $_____ –

9. TOTAL – Line 7 plus Line 8, (if any) $ .1,034,062. . .

10. Maximum Insurable Mortgage in Multiples of $100, (Item 1(e) or Item 9 whichever is the Lesser) if Grants involved see Reverse Side of this Form for Reconciliation of Adjustments, if Required $ 1,034,100

---

**38.** *See* n. 23, *supra.*

Johnson claims that during the October meeting, Mills and Duncan assured him that the increased management fee would be effective retroactively to January 1, 1976 and not January 1, 1977, as the contract purports. Accordingly, Johnson contends that he is entitled to recover damages from the Secretary totaling $4,072.42 [39] for lost management fees for 1976.

■ Initially, a careful examination of the evidence presented reveals only that the parties did *discuss* the possibility of executing a new management contract that would be effective retroactively to *some previous date*, but not that either Duncan or Mills *promised* or *assured* Johnson that the new management agreement, which was actually approved, would be retroactive to January 1, 1976. Hence, Johnson has not proved his claim as a matter of fact.

As a matter of law, the theory upon which Johnson predicates his claim against the *Secretary* to recover housing management fees is far from certain. It is clear that the Secretary is not a party to the January 1, 1977 housing management contract and that plaintiff's claim is not for breach of *that* contract. Assuming that the Secretary failed to approve a contract retroactive to January 1, 1976, contrary to his agent's representations to do so, as pleaded, Johnson has offered no evidence to prove that Park Manor Homes could not have obtained a housing management contract for the Laurel Gardens project with a management fee in excess of 6% without the Secretary's approval. If the Secretary's approval were required, Johnson's complaint, at best, states a claim for misrepresentation or interference with contract rights, both of which are barred by the FTCA.[40] Moreover, 28 U.S.C. § 2680(h) excludes actions arising out of misrepresentation, deceit or interference with contract rights. Therefore, no specific waiver of sovereign immunity permits recovery on this claim.

## V. CONCLUSION

Therefore, IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff shall take nothing under the second, third, and fourth claims and that those claims be and are hereby dismissed on their merits, with costs to the defendant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff shall take nothing under the first claim and that his personal claims for damages on that claim be and are hereby dismissed on their merits, with costs to the defendant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the plaintiff shall be and hereby is granted thirty days leave to amend his complaint to substitute Laurel Gardens, a Partnership in Commendam, as the proper plaintiff.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Laurel Gardens, a Partnership in Commendam, if substituted as a party plaintiff to this action within thirty days of this order, recover on the first claim from the defendant a sum equal to the amount of interest reduction payments it is entitled to receive pursuant to 12 U.S.C. § 1715z–1 on $36,400, plus legal interest on that sum from the date of final endorsement, with costs to defendant.

IT IS FURTHER ORDERED that counsel for plaintiff and for the defendant meet to determine the amount defined in the immediately preceding paragraph of this order. The parties shall meet only in the event Laurel Gardens is substituted as plaintiff to this action and in that event, within ten (10) days from the date of substitution. In the event of a disagreement over that amount, counsel are directed to inform the court in writing on or before the tenth day after their meeting, of their separate calculations of the amount so defined for resolution by the court.

IT IS SO ORDERED.

---

**39.** Plaintiff's Exhibit P–110 indicates that the rental income for the Laurel Gardens project was $108,598 for 1976. The claimed management fees for 1976 are $10,588.30 (9.75% of $108,598) or $4,072.42 greater than the management fees actually received for 1976 or $6,515.88 (6% of $108,598).

**40.** *See* n. 23, *supra*.