Lewis E. JOHNSON, Plaintiff-Appellant,

v.

The SECRETARY OF AND U.S. DE-PARTMENT OF HOUSING AND UR-BAN DEVELOPMENT, FEDERAL HOUSING ADMINISTRATION, De-fendants-Appellees.

No. 81–3793.

United States Court of Appeals,
Fifth Circuit.

Aug. 1, 1983.

Dutel & Dutel, Russell J. Nunez, Jr., William J. Dutel, New Orleans, La., for plaintiff-appellant.

Joan Elaine Chauvin, Asst. U.S. Atty., New Orleans, La., Charlene Berry, Dept. of HUD Region, Office of the Regional Administration, Fort Worth, Tex., Michael Kimmel, Dept. of Justice, Civil Div., Appellate Staff, Richard A. Olderman, Washington, D.C., for defendants-appellees.

Before WILLIAMS and JOLLY, Circuit Judges and WILL[*], District Judge.

E. GRADY JOLLY, Circuit Judge:

This appeal seeks money damages in connection with the development and construction of a low-cost housing project. It arises from the exclusion by the Secretary of Housing and Urban Development ("Secretary") of the profit and overhead paid by a project owner to a subcontractor from the total amount of the insurable mortgage. The Secretary made the exclusion because he found that the subcontractor had an "identity of interest" with the owner. We agree that the Secretary acted arbitrarily, capriciously and erroneously in finding an "identity of interest." We agree that the amount in question should have been included in the total amount of the insurable mortgage. Nevertheless, with the exception of the district court's dismissal of Lewis E. Johnson's claim for the monetary amount which he would have received as interest reduction payments on $36,400, we affirm the district court's dismissal of the complaint. We do so on the ground that a judgment for the other monetary amounts sought as damages in this case cannot come

[*] District Judge of the Northern District of Illinois, sitting by designation.

from the funds in the possession and control of the Secretary. Because a judgment for such amounts in this case can be paid only from the general public treasury, the doctrine of sovereign immunity prevents the recovery here sought.

## I.

Section 236 of the National Housing Act, as amended, 12 U.S.C. § 1715z–1, provides a program of mortgage insurance intended to induce private lenders to finance low-cost housing projects by authorizing the Secretary of the Department of Housing and Urban Development to insure eligible mortgages. Under this program, a private lender provides permanent financing for construction of a rental housing project, and the Secretary insures the mortgage and agrees to buy it out in case of default. 12 U.S.C. § 1715e. Section 236 also encourages private industry to provide reduced rental housing by authorizing the Secretary to subsidize the monthly mortgage interest payments to the lending institution on behalf of the owner. 12 U.S.C. § 1715z–1.

Section 236 provides that the Secretary will make direct interest reduction payments to the lender in behalf of the owner-mortgagor. These payments are equal to the difference between the monthly payment for principal and interest, which the project owner as mortgagor is obligated to pay at market rates, and the amount that the owner would pay if the mortgage bore interest at the rate of one percent (1%) a year, 12 U.S.C. § 1715z–1(c). This subsidy to the owner results, of course, in lower operating costs which enable section 236

project owners to charge lower rents to their tenants. In return, project owners are strictly regulated in the amount of rent they can charge and profits they can earn. 12 U.S.C. § 1715z–1(f)(1) and (e); 24 C.F.R. § 236.55. Section 236 is also intended to induce private lenders to readily finance low-cost housing projects by authorizing the Secretary to insure eligible mortgages against default (including advances during construction). 12 U.S.C. § 1715e.

In other words, HUD's involvement in advancing the housing program under section 236 is limited to: (1) insuring the mortgagee against default; (2) providing in behalf of the owner-mortgagor a direct payment to the mortgagee-lender of monthly mortgage interest payments; and (3) approving and regulating, *inter alia,* construction costs and charges, rents charged and profits earned.

On October 22, 1972, the Federal Housing Commissioner, acting on behalf of the Secretary and pursuant to section 236, accepted the proposed Laurel Gardens Apartment Project ("the project") as an insurable risk and issued a Commitment for Insurance of Advances to the Bank of New Orleans Mortgage Corporation ("BNO"). The Department of Housing and Urban Development ("HUD") committed to insure the mortgage note for ninety percent of the $1,174,643 replacement cost of the project, to be located in New Orleans, Louisiana, to a maximum of $1,057,100.

Ultimately, the sponsor and general contractor of the project, Lewis E. Johnson, was found by HUD to have an "identity of interest"[1] with one of his subcontractors,

---

1. The only statutory, regulatory or contractual definition of the term "identity of interest" is found in ¶ 5 of the Agreement and Certification executed between Laurel Gardens, BNO and the Secretary. That provision equates an identity of interest with any "financial interest" or family relationship which exists between the mortgagor and the general contractor or any subcontractor. The full text of ¶ 5 provides: "Mortgagor certifies that the financial interests or family relationships which exist between Mortgagor and any of its officers, directors or stockholders with the Architect and with the General Contractor, subcontractors, suppliers or equipment lessors are:."

The record contains two additional official HUD definitions of "identity of interest." HUD Handbook 4450.1 ¶ 6–5, page 6–9 (revised November 1972) (Defendant's Exhibit G–2) states:
"Identity of Interest" means any relationship which would give the general contractor control or influence over the price paid to the subcontractor. Usually this would be by the general contractor having a financial interest in the subcontractor, but it could be by other means, such as a family relationship.
The Mortgagor's Certificate of Actual Cost, FHA Form 2330 (Plaintiff's Exhibit P–36) provides:
Identity of interest between the mortgagor and/or sponsor as parties of the first part

A.J. Ward, Jr. As a result of this finding, HUD disallowed the amount of $36,519 from the mortgagor's certificate of actual cost. This amount represented Ward's profit and overhead on the project. Consequently, Johnson, as general contractor on the project, was forced to pay the disallowed amount of $36,519 to Ward from his own funds as opposed to those funds disbursed to him by BNO under the HUD commitment. In addition, because of this finding of an identity of interest with Ward, certain amounts were disallowed from the mortgagor's certificate of actual cost. In all, a total amount of $40,376 was disallowed. These disallowances resulted in a reduction by the Secretary of the maximum insurable mortgage on the project from $1,034,100 to $997,700. The mortgage loan for the project was accordingly reduced by $36,400. The project was thereby deprived of the interest reduction payments the Secretary would have been required to make over the life of the mortgage to BNO on $36,400. Finally, a purchase agreement for the project had been reached with the National Corporation for Housing Partnerships ("NCHP") and the National Housing Partnership ("NHP").[2] The purchase agreement provided that, in addition to assuming the mortgage, the price of the purchased interest paid to Johnson would equal 10.03% of 99% of the mortgage loan authorized by the Secretary for final endorsement for insurance, but not in excess of $105,000. Consequently, because of the Secretary's reduction of the maximum insurable mortgage by $36,400, the purchase price of the 99% interest in the project was reduced by $3,614.41.

Johnson also claimed that he had sustained the following losses as the result of the identity of interest finding: (1) a builder's and sponsor's Profit and Risk Allowance of $3,651.90; and (2) an architect fee of $1,700. Both of these items were disallowed from the mortgagor's certificate of actual cost and are part of Johnson's claimed damages.

Filing suit in district court, Johnson sought as damages the monetary amounts referred to in the two preceding paragraphs as well as the interest reduction payments which would have been made on $36,400.[3] After a five-day trial, the district court ruled that HUD had acted arbitrarily and capriciously in finding that an identity of interest existed between Johnson and Ward, but that Laurel Gardens, a Partnership in Commendam, was the real party in interest. It went on to find that the Secre-

and general contractors, subcontractors, material suppliers, or equipment lessors as parties of the second part will be construed as existing under any of the following conditions:

When there is any financial interest of the party of the first part in the party of the second part; when one or more of the officers, directors or stockholders of the party of the first part is also an officer, director, or stockholder of the party of the second part; when any officer, director or stockholder of the party of the first part has any financial interest whatsoever in the party of the second part; when the party of the second part advances any funds to the party of the first part; when the party of the second part provides and pays on behalf of the party of the first part the cost of any architectural services or engineering services other than those of a surveyor, general superintendent, or engineer employed by a general contractor in connection with his or its obligations under the construction contract; when the party of the second part takes stock or any interest in the party of the first part as part of the consideration to be paid them; when there exists or come into being any side deals, agreements, contracts or undertakings entered into or contemplated, thereby altering, amending, or cancelling, any of the required closing documents except as approved by the Commissioner.

2. To encourage maximum participation by private investors in programs and projects designed to provide housing for low- and moderate-income families, Congress authorized, in 1968, the creation of a private corporation for profit which could build, rehabilitate, buy, own, manage, lease and otherwise acquire and dispose of housing development projects and other related facilities. 42 U.S.C. § 3931. That corporation, the NCHP, a District of Columbia corporation, was additionally authorized to form, as a separate organization, a limited partnership, now known as the NHP, a District of Columbia limited partnership.

3. No calculation was made of the amount of these payments because of the complexity of making such a calculation.

tary was liable to Laurel Gardens for a sum equal to the amount of interest reduction payments that would have been paid on $36,400. The district court, however, found that because Laurel Gardens, not Johnson, was the real party in interest, the Secretary was not liable to Johnson for any of the claimed damages, including the interest reduction payments. Johnson was granted leave to amend his complaint and substitute Laurel Gardens in his place as plaintiff. Johnson did not amend, but rather moved for reconsideration. The motion for reconsideration was denied, and Johnson's complaint was thereupon dismissed in its entirety. *Johnson v. Secretary of/and U.S. Department of Housing and Urban Development,* 544 F.Supp. 925 (E.D.La.1981).

On appeal, Johnson contends that he was the real party in interest and that he should be allowed to recover damages from the Secretary as aforenoted.

## II.

Our story began in 1971. Johnson and Warren Orr were the owners of certain land in New Orleans upon which Clifford Sherman and George Potter intended to construct a section 236 low-income housing project. Several deaths interceded. Orr died in January 1972, while negotiations for the land were still pending. Sherman died after the Secretary, in October 1972, issued a ninety-day Commitment to Insure the project for $1,057,100. This Commitment to Insure was based upon having Sherman and Potter as sponsors; with the death of Sherman a new sponsorship was formed consisting of Potter, Johnson and A.J. Ward, Jr. This new group of sponsors was proposed to HUD in March 1973. Ward was to be the general contractor.

Although the New Orleans Area Office of HUD (HUD/NOAO) initially rejected Ward as unsuitable for sponsorship of the project, Ward felt that it would eventually accept him after it reconsidered the matter. Accordingly, he and Johnson obtained a loan from the Bank of New Orleans (BNO) to help purchase the land for the project. The note evidencing the loan of $117,000 was executed by Johnson and Ward and bound them "in solido." The proceeds of the loan were deposited in the account of Laurel Gardens. Concurrently, Johnson and Ward executed a written agreement that was intended to release Ward from any liability on the note if HUD/NOAO failed to reverse its earlier determination rejecting Ward as a sponsor. At the time of the execution of the promissory note and release, neither Johnson nor Ward knew that Ward would ultimately be unacceptable to HUD/NOAO as sponsor of the project.

After meeting with Ward, HUD/NOAO again rejected him as a sponsor of the project. Simultaneously with the rejection, an alternate sponsorship in which Johnson would hold a ninety-five percent interest in the project with Potter as a five percent limited partner was proposed to HUD. As part of the proposal, Johnson would build the project as the general contractor. HUD/NOAO approved this proposal on the same day it rejected Ward.

On April 20, 1973, the initial closing of the project was completed. Documents necessary to begin the construction of the section 236 project which had been insured for advances were each executed by the initial closing date. These agreements defined the relationship between HUD, the project mortgagor sponsor (Laurel Gardens), the mortgagee (BNO) and the general contractor (Johnson). Most of the documents were executed in the name of Laurel Gardens, a Partnership in Commendam, consisting of Johnson as general partner and ninety-five percent owner, and Potter as limited partner and five percent owner. At the closing, HUD estimated it would insure the mortgage for ninety percent of its $1,174,630 replacement cost, or $1,057,100. The Agreement and Certification, signed by HUD, BNO, and Laurel Gardens, plainly stated in section 9, that the Secretary would disallow a subcontractor's profit and overhead (and hence reduce the mortgagor's final insurable mortgage) whenever an identity of interest existed between the mortgagor and the subcontractor if advance written approval of the relationship had not been secured by HUD.

Sometime between April 19, 1973, and June 29, 1973, the Laurel Gardens partnership was dissolved when Potter conveyed all of his interest in the partnership to Johnson.

When the construction phase of the project began, Johnson allowed Ward to bid on certain portions of the project. Because his bid was lower than the cost at which Johnson estimated he could perform such work, Johnson agreed to subcontract certain portions of the construction work to Ward. On June 29, 1973, Johnson and Ward's Packaged Homes, Inc., of which Ward was president and principal stockholder, executed an agreement in which Ward promised to furnish certain materials and labor for the project.

On January 11, 1974, Laurel Gardens (through Johnson) entered into a purchase agreement with the NCHP and the NHP by which Laurel Gardens agreed to sell and transfer a ninety-nine percent interest in the project to the NCHP and NHP.[4] The purchase price was contingent upon the amount of the mortgage loan authorized by the Secretary for final endorsement for insurance. As a result of these transactions effective January 11, 1974, the transfer date of the agreement, Johnson became a general partner of the Laurel Gardens project and owns a one percent interest;[5] the NCHP owns a one percent interest as a general partner; and the NHP owns a ninety-eight percent interest as a partner in commendam.

On May 22, 1974, HUD/NOAO received the cost certification for the Laurel Gardens project. In the process of reviewing the certification, HUD/NOAO observed that the $117,000 note executed by Johnson and Ward still appeared on Laurel Gardens' balance sheet. Accordingly, HUD/NOAO asked Johnson for an explanation of the note. Three months later, Johnson provided the following information:

Prior to the closing, Mr. Johnson and Mr. Ward, as your administration is aware, were going to form a partnership in commendam. In view of the fact the allocation of land was $148,700, this money was used as additional expense in closing of the loan originally, and Mr. Johnson would be sole obligor of the note with A.J. Ward being relieved of any obligation prior to closing.

On November 21, 1974, HUD/NOAO forwarded its review of the cost certification for the project to HUD's Dallas Regional Office for its review and concurrence. The Dallas Regional Office subsequently notified HUD/NOAO that an identity of interest existed between Johnson and Ward necessitating that Ward certify his actual costs. Until such certification was received, even though the Laurel Gardens project was substantially completed, a maximum insurable mortgage could not be determined, and there would be no final endorsement.

In response, Ward's certificate of actual cost was submitted. The Dallas regional office then determined that the sum of $36,519, representing Ward's profit and overhead, should be disallowed from the amount which was to be paid to Ward for the work performed under the subcontract between him and Johnson. This action was mandated by the Agreement and Certification document itself, executed on April 19, 1973, which required that an identity of interest be disclosed prior to the award of a contract or the start of the work, and provided that if an identity was not disclosed, the subcontractor's overhead and profit would be disallowed from the actual costs of the project. As noted above, Johnson, as general contractor on the project, was forced to pay the disallowed amount of $36,519 to Ward from his own funds rather than from the HUD guaranteed loan funds disbursed by the BNO.

Because the total amount of the insured mortgage was thus reduced, Johnson's Builder's and Sponsor's Profit and Risk Al-

---

**4.** See n. 2, *supra.*

**5.** Laurel Gardens was the name of the project as well as the name of the partnership which sponsored and owned the project. As previously noted, Johnson had bought out the interest of the other partner thereby dissolving Laurel Gardens as a partnership.

lowance was disallowed on the disallowed amount and hence reduced by $3,651.90. It was also determined that an identity of interest existed between the architect for the project and Ward. As a result the architect's fee of $1,700 was disallowed and Johnson was forced to pay, from his own funds, this amount to the architect. All in all, the approved actual cost of the project was reduced by a total of $40,376 as the result of HUD's identity of interest findings.

After the identity of interest findings were made, the matter was referred back to HUD/NOAO. At this time, HUD/NOAO was informed of the agreement in which Johnson had agreed to "do all that is necessary to remove" Ward from the promissory note if their agreement "relative to their respective interests and obligations in the Laurel Gardens" project was not consummated on or before April 23, 1973. HUD/NOAO never forwarded this information to the Dallas Regional Office and made no recommendation that this information be considered by the Dallas office.

On May 24, 1975, HUD approved for final endorsement for insurance a maximum insurable mortgage for the project in the amount of $997,700. As noted previously, the owner was thereby deprived of interest reduction payments on $36,400 over the life of the mortgage; there is no doubt that aside from the interest reduction payments, Johnson was damaged by $45,485.31 [6] because of the identity of interest determination.

### III.

In the Commitment for Insurance of Advances and the Agreement and Certification, the Secretary promised to insure the mortgage for the project in the amount of $1,057,100, subject to any reductions as provided in the Act and the regulations promulgated thereunder. As the district court

---

**6.** This includes, in addition to the amount of $40,376 which was specifically disallowed, the loss of $3,614.41 from the reduced purchase price paid for the project by NCHP and NHP.

**7.** Rule 17 of the Federal Rules of Civil Procedure states that every action shall be prose-

correctly found, Johnson's claim that the Secretary acted tortiously by reducing the insurable maximum mortgage for the project is properly characterized as one for tortious breach of contract because the activity about which Johnson complains is the subject of a promise made by the Secretary pursuant to an express contract.

█ To hold the Secretary liable for reducing the insurable amount, Johnson had to demonstrate that he was the real party in interest, that the Secretary's finding of an identity of interest between Ward and Johnson was arbitrary and capricious, and that his claim was not barred by sovereign immunity, i.e., that it could be paid out of funds in the control and possession of the Secretary, rather than from the general funds of the United States Treasury.

### IV.

█ With respect to whether Johnson was the real party in interest, we believe that the district court erred in finding that Laurel Gardens, rather than Johnson, was the real party in interest.[7] Because the question as to whether Johnson was the proper party to bring the claim was not raised either prior to or during the trial, there was no evidentiary development of this issue during the trial. The issue of real party in interest was raised by the district court on its own motion only after the trial.

The basis for the district court's conclusion that Johnson was not the real party in interest is its assumption that Johnson and Potter were partners on the date on which the claim arose, May 23, 1975, and/or continued to be partners on the date the complaint was filed herein, December 15, 1977. Therefore, based on Louisiana law, which holds that as long as the partnership exists and has not been dissolved or liquidated, it alone can maintain an action on the partnership claims, the district court held that

---

cuted in the name of the "real party in interest." The effect of this provision is that a party has standing to prosecute a suit in federal court only if he is the "real party in interest." *United States v. 936.71 Acres of Land, State of Florida,* 418 F.2d 551, 556 (5th Cir.1969).

Johnson did not possess the substantive right to complain that the Secretary improperly reduced the insurable amount of the mortgage.

It appears, however, that the district court did not take into account the fact that the parties had entered into a Stipulation of Facts for Purposes of Trial which stated that on a date between April 19, 1973, and June 29, 1973: "Potter conveyed all of his interest in the partnership (i.e., Laurel Gardens), a partnership in commendam, to Lewis E. Johnson."

Article 2876 of the Louisiana Civil Code which provides for the termination of a partnership, states in part:

A partnership ends ... (5) *by the will of all the parties, legally expressed* or by the will of any of them founded on a legal cause, and expressed in the manner directed by law. (Emphasis added.)

The Articles of Partnership of Laurel Gardens stated that the partnership could be terminated by the vote of a majority in interest of the partners.

Practically speaking, when Potter conveyed all of his interest in the partnership to Johnson, Potter voted to dissolve the partnership by making this conveyance, and Johnson acceded to this vote by accepting Potter's conveyance. *See Mitchell v. Murphy,* 131 La. 1040, 60 So. 677 (La.1913). The partnership having been terminated and all interest conveyed to Johnson, Johnson had the right to pursue the partnership claims. *Johnson v. Iowa Rice Dryer, Inc.,* 226 So.2d 194 (La.Ct.App.1969).

Therefore, because the former Laurel Gardens partnership was in dissolution at the time the claims asserted herein arose, and/or by the time the suit was filed, Johnson, under Louisiana law, had the substantive right to claim that the Secretary improperly reduced the maximum mortgage insurance for the Laurel Gardens project. He was the real party in interest.

### V.

We agree with the district court that the Secretary acted arbitrarily and capriciously in finding an identity of interest between Johnson and Ward. The note for $117,000 which Ward and Johnson had executed in favor of BNO was to secure money necessary to complete the purchase of the property on which the project would be built. Johnson and Ward, however, recognized the possibility that Ward might not be approved as a sponsor. If that happened, Ward did not wish to be liable under the promissory note. Consequently, he and Johnson executed an agreement in which Johnson agreed to "do all that is necessary to remove" Ward from the note if an agreement "relative to their respective interests and obligations in the Laurel Gardens" project was not consummated on or before April 23, 1973. By this agreement, Johnson intended to release Ward from any obligation on the promissory note if HUD/NOAO rejected Ward as a project sponsor. As the district court found, this agreement constituted a legally effective release.

HUD/NOAO was informed of the release agreement after the Regional Office in Dallas had made the determination that an identity of interest existed between Ward and Johnson. Despite the significance of this information which showed that Ward was no longer obligated on the note, HUD/NOAO did not notify the Dallas Regional Office of the existence of the release agreement or its contents. In addition, HUD/NOAO did not recommend that the identity of interest finding be reversed or even reviewed. As a result, the Dallas Regional Office had no opportunity to consider the effect of the release agreement on the identity of interest finding.

Because no appeals procedure is provided by HUD's regulations, the identity of interest finding by the Dallas Regional Office represents the Secretary's final determination. Such a determination was based on incomplete information. Information which would have called for a different result was arbitrarily and capriciously ignored. Consequently, as found by the district court, the Secretary's final determination that the promissory note created an identity of interest between Ward and Johnson was arbitrary, capricious and erroneous.

## VI.

The final question is whether Johnson's claims are barred by sovereign immunity. To show that sovereign immunity has been waived as to his claim, Johnson relies on section 1 of the Act, 12 U.S.C. § 1702. This section provides in relevant part that:

The Secretary shall, in carrying out the provisions of [*inter alia,* the Act], be authorized in his official capacity, to sue and be sued in any court of competent jurisdiction, state or federal.

Since the basis of Johnson's claim against the Secretary results from HUD's commitment to insure a mortgage on a section 236 rental housing project, which HUD clearly undertook in carrying out the provisions of section 236, the suit falls within the qualified waiver of sovereign immunity.

In *Industrial Indemnity, Inc. v. Landrieu,* 615 F.2d 644 (5th Cir.1980), however, we made it clear that section 1702 is a waiver of the immunity of HUD only, and that the section is neither a grant of jurisdiction nor a waiver of the United States generally. Therefore, for a claim to be against the Secretary, and thus within the scope of the "sue and be sued" clause, as opposed to a suit against the United States, any judgment for the plaintiff must be paid from funds in the possession and control of the Secretary as distinguished from general Treasury funds. *Id.* at 646. This requirement is satisfied if the judgment can be paid out of funds appropriated under the National Housing Act and in the control or subject to the discretion of the Secretary.

In this case, Johnson suggests that there is an identifiable source of funds in the control of the Secretary from which the judgment can be satisfied. This is the Special Risk Insurance Fund created by 12 U.S.C. § 1715z–3(b). Under the provisions of this section, the Secretary is authorized to pay

all payments made pursuant to claims of mortgagees [pursuant to certain sections of the Act], cash adjustments, the principal of and interest paid, on debentures which are the obligation of the fund, expenses incurred in connection with or as a consequence of the acquisition and disposal of property acquired under such sections, and *all administrative expenses in connection with the mortgage insurance operations under such sections* . . . . (Emphasis added.)

Johnson contends that the judgment would fall within the category of "administrative expenses" and would thus be payable from the Special Risk Insurance Fund. We must therefore focus on what "administrative expenses" are actually incurred by the Secretary "in connection with the mortgage insurance operations" while administering the section 236 program.

As noted above, section 236 authorizes the Secretary to subsidize the monthly interest payments to the lender on behalf of the owner. In our opinion, this subsidy is an "administrative expense." Specifically, the Secretary makes interest payments to the lending institution equal to the difference between the monthly payment for principal and interest, which the mortgagor is obligated to pay at market rates, and the amount that the owner would pay if the mortgage bore interest at the rate of one percent per year. This is the only money expended by HUD, to or on behalf of the project owner, and it is the only "administrative expense" of the Secretary in connection with the mortgage insurance operations which is relevant to our consideration.

Consequently, even if it had correctly handled the identity of interest question and not improperly disallowed the subject costs, HUD would have been obligated only to make the interest reduction payments over the life of the mortgage loan on $36,-400. This HUD obligation would have resulted from the increased amount of the total insured mortgage on which HUD was committed to make interest reduction payments.

As noted above, Johnson was the real party in interest. Consequently because interest reduction payments would constitute an administrative expense and would thus be payable from a fund controlled by the Secretary, Johnson, contrary to the district court's finding, is entitled to the monetary

amounts he would have received had HUD made interest-reduction payments over the life of the mortgage loan on $36,400.

Assuming HUD had made a proper identity of interest finding, it would not have made the other monetary payments to Johnson which he seeks as damages. It would merely have approved the amounts as part of the guaranteed loan. BNO, the lender-mortgagee, would then have loaned and paid the money to Johnson, and simultaneously increased its HUD guaranteed loan to Johnson by that amount. As the damages sought do not qualify as expenses, administrative or otherwise, which, under the statute, the Secretary could ever have incurred or been empowered to pay, it follows that such monies are not payable from the fund subject to the Secretary's discretion and control. A judgment for these damages would expend itself against the public treasury. This makes the present suit one against the *United States, Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), and does not come within the limited waiver of sovereign immunity contained in 12 U.S.C. § 1702. Johnson has thus failed to state a claim for these amounts under the National Housing Act.[8]

For the above and foregoing reasons, the dismissal of the complaint by the district court is affirmed with the exception of its dismissal of Johnson's claim for the monetary amount which he would have received as interest reduction payments on $36,400. Because the present record is not sufficient to allow us to make a calculation of this amount, the case is remanded to the district court for the purpose of making such a calculation and for entry of a judgment in Johnson's favor for the appropriate amount.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

8. Because we are not called upon to do so in the present action, we do not express any view as to whether Johnson, by seeking injunctive or some other form of relief, could have forced HUD to apply properly its identity of interest regulations and, as a result, to increase the insurable mortgage.